# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

ANTONIO SIMMONS,

        Plaintiff,

    v.

WARDEN STANLEY WILLIAMS; JAMES
DEAL; WAYNE JOHNSON; ERIC
SMOKES; JOHNNY DAVIS; RONNIE
BYNUM; CURTIS WHITFIELD; ANTONIO
ABALOS; JOHNATHAN SANTIAGO;
ZECHARIAH JONES; PAUL GRIFFIN; and
ANDREW MCFARLANE,

        Defendants.

CIVIL ACTION NO.: 6:14-cv-111

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, who is currently housed at Smith State Prison in Glennville, Georgia, filed this cause of action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, *et seq*., contesting certain conditions of his confinement. Defendants filed a Motion to Dismiss, (doc. 41), to which Plaintiff filed a Response, (doc. 54). In addition, Plaintiff filed a Motion for Default Judgment, (doc. 46), four Motions for Judgment as a Matter of Law, (docs. 71, 72, 73, 75), and a Motion for Injunction, (doc. 83).

The Court should **DENY** Plaintiff's Motion for Default Judgment, (doc. 46), **DENY** Plaintiff's Motions for Judgment as a Matter of Law, (docs. 71, 72, 73, 75), and **DENY** Plaintiff's Motion for Injunction, (doc. 83). Further, for the reasons which follow, the Court

should **GRANT in part** and **DENY in part** Defendants' Motion to Dismiss, (doc. 41). Specifically, I **RECOMMEND** the following:

- The Court should **GRANT** Defendants' Motion to Dismiss Plaintiff's retaliation and forced shaving claims. Due to Plaintiff's failure to exhaust his administrative remedies as to those claims, the Court should **DISMISS** those claims **WITHOUT PREJUDICE**.

- The Court should **GRANT** Defendant's Motion to Dismiss Plaintiff's Procedural Due Process Claims, and **DISMISS** those claims for failure to state a claim.

- The Court should **GRANT IN PART AND DENY IN PART** Defendants' Motion to Dismiss Plaintiff's RLUIPA claims based on the exposure of Plaintiff's awrah. The Court should **DISMISS** Plaintiff's RLUIPA claims for monetary relief, but his RLUIPA claims for injunctive and declaratory relief based on the exposure of his awrah should remain pending against Defendants Abalos, Davis, Griffin, Santiago, and Whitfield.

- The Court should **GRANT IN PART AND DENY IN PART** Defendants' Motion to Dismiss Plaintiff's First Amendment claims based on the exposure of his awrah. The Court should **DISMISS** Plaintiff's First Amendment claims for monetary relief based on the exposure of his awrah, but his First Amendment claims based on the exposure of his awrah for injunctive and declaratory relief should remain pending against Defendants Abalos, Davis, Griffin, Santiago, and Whitfield.

- The Court should **GRANT IN PART AND DENY IN PART** Defendants' Motion to Dismiss Plaintiff's Fourth Amendment claims. The Court should **DISMISS** Plaintiff's Fourth Amendment claims for monetary relief, but Plaintiff's Fourth Amendment claims for injunctive and declaratory relief against Defendants Abalos, Whitfield, and Santiago should remain pending.

2

- The Court should **DENY** Defendants' Motion to Dismiss Plaintiff's Eighth Amendment excessive force claims. Plaintiff's excessive force claim based on the use of pepper spray should remain pending against Defendants Abalos and Whitfield. Plaintiff's excessive force claim based on the use of a "chicken wing maneuver" should remain pending against Abalos, Whitfield, and Santiago.

- The Court should **DENY** Defendants' Motion to Dismiss Plaintiff's Eighth Amendment failure to intervene claims. Plaintiff's claims for failure to intervene during the use of pepper spray and during the use of a "chicken wing maneuver" should remain pending against Defendants Williams, Deal, Johnson, McFarlane, Smokes, Davis, and Griffin. Plaintiff's failure to intervene claim during the use of pepper spray should also remain pending against Defendant Santiago.

- The Court should **DENY** Defendants' Motion to Dismiss Plaintiff's Eighth Amendment deliberate indifference to medical needs claims. These claims should remain pending against Defendants Whitfield, Santiago, Griffin, Abalos, Williams, Deal, Smokes, Johnson, and McFarlane.

- The Court should **GRANT** Defendants' Motion to Dismiss Plaintiff's Eighth Amendment conditions of confinement claims and **DISMISS** those claims for failure to state a claim.

- The Court should **DENY** Defendants' Motion to Dismiss Plaintiff's supervisory liability claims as Plaintiff does not base his claims on Defendants' mere supervisory position.

# BACKGROUND[1]

Plaintiff contends that Defendants Whitfield, Santiago, Abalos, Griffin, Williams, Deal, Johnson, McFarlane, and Smokes subjected him to two instances of excessive force on April 12, 2013, during a shakedown of his dormitory, which led to a spate of additional constitutional violations. Specifically, Plaintiff asserts that Defendants Whitfield and Santiago led Correctional Emergency Response Team ("CERT") officers[2] to his cell while he and his cellmate were reading the Qu'ran. (Doc. 1, p. 6.) Defendant Santiago then ordered Plaintiff to submit to a body cavity search, which required Plaintiff to remove his clothes, bend over at the waist, and spread his buttocks so officers could visually inspect his anal cavity. (Id.) Plaintiff contends he informed Defendant Santiago that his religious beliefs prohibited him from being naked in the presence of another man and he, therefore, could not comply with the search. (Id. at p. 7.) Plaintiff requested that Defendants allow him to comply in an alternate manner. (Id.)

Following Plaintiff's request, Defendant Whitfield agreed to conduct the search in a manner comporting with Plaintiff's beliefs. (Id. at p. 9.) Shortly thereafter, however, Defendant Whitfield directed Defendant Abalos to spray Plaintiff with pepper spray. (Id. at p. 10.) After Defendant Abalos sprayed Plaintiff, Defendants left Plaintiff in his cell for thirty to forty-five minutes. During this period of time, Plaintiff could not breathe and intermittently lost consciousness. Plaintiff avers that Defendants ignored his requests for medical attention during this time. After this time passed, the CERT team returned to Plaintiff's cell and threatened to spray him again if he did not comply with the body cavity search. (Id. at pp. 11–12.) Plaintiff

---

[1] The Court takes the recited allegations from Plaintiff's Complaint, (doc. 1), accepts them as true, and views them in the light most favorable to Plaintiff, as it must at this stage.

[2] Plaintiff lists Defendants Whitfield, Abalos, Santiago, Jones, and Griffin as members of the CERT team. Accordingly, the Court construes Plaintiff's allegations against the "CERT team" as against each of these Defendants.

then submitted to a body cavity search "under force[,] [ ] threat, duress[,] and coercion." (Id. at p. 12.) Plaintiff alleges Defendants Williams, Deal, Johnson, McFarlane, and Smokes watched these events unfold but did nothing. (Id.)

After Defendant Abalos conducted the body cavity search, unnamed officers placed Plaintiff in a shower without running water for ten to fifteen minutes. (Id. at p. 13.) Plaintiff was "left inside [the] shower burning and unable to see." (Id.) While in the shower, he "pleaded for the help and assistance of Warden Williams, James Deal, and Captain McFarlane" but his "[pleas and cries] went unanswered." (Id.) CERT team officers later placed Plaintiff in a functional shower, but the water temperature was too hot and intensified Plaintiff's burning and pain. (Id.) When Plaintiff called to Defendant Williams from the shower in pain, Defendant Williams replied that Plaintiff should have complied with orders. (Id.) Plaintiff asserts Defendants Williams, Deal, and McFarlane knew he was in pain and in need of medical attention but did nothing to help him.

After his shower, the CERT team attempted to escort Plaintiff to the medical unit. However, Plaintiff fainted during this escort. (Id. at p. 14.) Defendants Abalos and Santiago then dragged Plaintiff to the medical unit using the "chicken wing" maneuver, which dislocated Plaintiff's shoulder. While being dragged to the shower and to the medical unit, Plaintiff's "awrah"[3]—which he describes as the area between his waist and knees—was exposed because prison staff provided him only one pair of white boxer shorts to wear. (Id. at pp. 12, 14.) Upon his arrival to the medical unit, medical staff provided no medical treatment to Plaintiff. (Id. at p. 15.) Following these events, Plaintiff was not allowed to clean or sanitize his cell for one to

---

[3] Plaintiff uses the word "aura", but it appears "awrah" is the correct spelling of this word in the given context. See http://www.bbc.co.uk/religion/religions/islam/beliefs/hijab_1.shtml#h4 (last visited July 24, 2017).

two weeks, even though the cell, his bedding, and his belongings were covered in pepper spray. As a result, Plaintiff's skin broke out in rashes and hives. (Id. at p. 16.)

Plaintiff alleges that, shortly thereafter, Defendants launched a campaign of retaliation against him. First, Defendant Abalos served a false disciplinary report upon Plaintiff immediately following Plaintiff's body cavity search. While serving this disciplinary report on Plaintiff, Defendant Abalos reminded Plaintiff that he had been told to withdraw his previously-filed grievances. (Id.) Following this encounter, Plaintiff called the Prison Rape Elimination Act ("PREA") hotline and reported the alleged sexual assault and misconduct by the officers during his body cavity search. (Id.) Plaintiff asserts that, after calling the PREA hotline, he filed another grievance pertaining to those events on April 15, 2013.

Two days later, Defendant Johnson threatened to file disciplinary reports against Plaintiff in response to Plaintiff's utilization of the PREA hotline and for filing another grievance. (Id. at p. 17.) Plaintiff alleges he then received another false disciplinary report from Defendant Johnson. Plaintiff contends that, during the disciplinary hearings on these two disciplinary reports, Defendant Bynum denied his rights to call witnesses and to present evidence. Plaintiff alleges Defendant Bynum then imposed severe and unconstitutional punishment on him for the purpose of retaliation, including nine (9) months' outdoor recreation restriction and 450 days' commissary, telephone, and package restrictions. According to Plaintiff, the sanctions he received "resulted in conditions of confinement that are much worse than what is normal for prisoners." (Id. at p. 19.)

Plaintiff also sets forth related events which allegedly occurred from June 13, 2013, through April 3, 2014. Plaintiff characterizes these events as another campaign of retaliation by Defendants in response to his filing of grievances. Specifically, Plaintiff claims Defendants

Williams and Johnson approached him on June 14, 2013, stated that the grievances Plaintiff filed had gotten Plaintiff "in trouble," and warned that Plaintiff should stop if he "knew what was best" for him. (Id. at p. 21.) Plaintiff also states Defendants Abalos and Jones "harassed and threatened" him while he was in the intake area on June 19, 2013. Plaintiff then alleges Defendants Williams and Deal threatened him on July 5, 2013, based on the grievances and other paperwork Plaintiff had filed. According to Plaintiff, Defendants Williams and Smokes then came to his cell and threatened him on July 30, 2013. Plaintiff contends Defendant Williams told Plaintiff he would have the CERT officers (including Defendants Whitfield, Santiago, Abalos, Griffin, and Jones) hurt him and that Defendant Williams was trying to find a "justifiable" way to kill Plaintiff. (Id.)

As laid out above, Plaintiff maintains Defendants harassed and threatened him over the course of several months, yet failed to follow through on their threats. (Id. at pp. 22–25.) However, Plaintiff claims Defendants took several retaliatory actions against him following these initial threats. First, Defendants forced him to shave, in violation of his religious beliefs. Second, Defendant Davis performed a "shakedown" of his cell on November 4, 2013, and took a portion of Plaintiff's property. Defendant Davis forced Plaintiff to shave on this same date and "said something about the papers [he] filed." (Id. at p. 23.) Finally, Plaintiff claims he was removed from his cell on February 6, 2014, and placed in a "hard cell" for no apparent reason. According to Plaintiff, a hard cell is a "punishment cell[,]" and his placement in this cell was retaliatory. (Id. at p. 24.)

On April 29, 2015, I issued a Report and Recommendation recommending that the Court dismiss the following claims: official capacity claims for monetary relief, sexual abuse claims, stand-alone verbal threat claims, substantive due process claims, deprivation of property claims,

and RLUIPA claims for monetary damages. (Doc. 9.) However, I found that Plaintiff stated claims for violation of his rights to procedural due process, non-monetary RLUIPA claims, First Amendment free exercise and retaliation claims, excessive force claims, supervisory liability claims, and Fourth Amendment claims. Id. Accordingly, I ordered that the Complaint be served on Defendants Bynum, Whitfield, Abalos, Santiago, Williams, Smokes, Griffin, Deal, Johnson, Davis, Jones, and McFarlane. Id.

## DISCUSSION

Defendants set forth several grounds for dismissal of Plaintiff's Complaint. First, Defendants contend Plaintiff failed to exhaust his retaliation claims and his Eighth Amendment claims regarding the forced shaving of his beard. (Doc. 41-1, p. 8.) Defendants further argue that Plaintiff fails to set forth a viable procedural due process claim, RLUIPA claim, First Amendment free exercise claim, Fourth Amendment claim, retaliation claim, supervisory liability claim, and Eighth Amendment excessive force, failure to intervene, and deliberate indifference claims. (Id. at pp. 13–31.) Finally, Defendants maintain they are entitled to qualified immunity and that Plaintiff is not entitled to injunctive relief. (Id. at pp. 35–37.)

## I.     Exhaustion of Administrative Remedies

### A.     Standard of Review

The determination of whether an inmate exhausted his available administrative remedies prior to filing a cause of action in federal court is a matter of abatement and should be raised in a motion to dismiss. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). "Because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense . . . is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for

summary judgment." Id. at 1374–75 (internal citation omitted). "Even though a failure-to-exhaust defense is non-jurisdictional, it is like" a jurisdictional defense because such a determination "ordinarily does not deal with the merits" of a particular cause of action. Id. at 1374 (internal punctuation and citation omitted). Further, a judge "may resolve factual questions" in instances where exhaustion of administrative remedies is a defense before the court. Id. In these instances, "it is proper for a judge to consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." Id. at 1376.

In Turner v. Burnside, 541 F.3d 1079 (11th Cir. 2008), the Eleventh Circuit Court of Appeals set forth a "two-step process" that lower courts must employ when examining the issue of exhaustion of administrative remedies. First, the court is to take the plaintiff's version of the facts regarding exhaustion as true. Id. at 1082. If, even under the plaintiff's version of the facts, the plaintiff has not exhausted, the complaint must be dismissed. Id. However, if the parties' conflicting facts leave a dispute as to whether plaintiff has exhausted, the court need not accept all of plaintiff's facts as true. Id. Rather, "the court then proceeds to make specific findings in order to resolve the disputed factual issues[.]" Id. "Once the court makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted his available administrative remedies." Id. at 1083. The Eleventh Circuit has held that a district court may consider materials outside of the pleadings and resolve factual disputes regarding exhaustion in conjunction with a Rule 12(b)(6) motion to dismiss so long as the factual disputes do not decide the merits of the case. See Bryant, 530 F.3d at 1376–77.

## B.      Legal Requirements for Exhaustion

Where Congress explicitly mandates, prisoners seeking relief for alleged constitutional violations must first exhaust inmate grievance procedures before filing suit in federal court.  See Porter v. Nussle, 534 U.S. 516, 524 (2002).  Section 1997e(a) of Title 42 of the United States Code states, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law . . . until such administrative remedies as are available are exhausted."   In Porter, the United States Supreme Court held that exhaustion of available administrative remedies is mandatory.  Porter, 534 U.S. at 523; see also O'Brien v. United States, 137 F. App'x 295, 301–02 (11th Cir. 2005) (finding lack of exhaustion where prisoner "prematurely filed his civil complaint . . . and . . . 'failed to heed that clear statutory command' requiring that his administrative remedies be exhausted before bringing suit").  Additionally, the Supreme Court recently "held that the PLRA's [Prison Litigation Reform Act's] text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.'  And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account."  Ross v. Blake, ___ U.S. ___, 136 S. Ct. 1850, 1856–57 (June 6, 2016).

The requirement that the exhaustion of remedies occur "first in an agency setting allows 'the agency [to] develop the necessary factual background upon which decisions should be based' and giv[es] 'the agency a chance to discover and correct its own errors.'"  Green v. Sec'y for Dep't of Corr., 212 F. App'x 869, 871 (11th Cir. 2006) (quoting Alexander v. Hawk, 159 F.3d 1321, 1327 (11th Cir. 1998) (first alteration in original)).  Furthermore, requiring exhaustion in the prison setting "eliminate[s] unwarranted federal-court interference with the administration of prisons" and allows "corrections officials time and opportunity to address

complaints internally before allowing the initiation of a federal case." Woodford v. Ngo, 548 U.S. 81, 93 (2006).

The Supreme Court has noted exhaustion must be "proper." Id. at 92. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 90–91. In other words, an institution's requirements define what is considered exhaustion. Jones v. Bock, 549 U.S. 199, 218 (2007).

Thus, under the law, prisoners must do more than simply initiate grievances; they must also appeal any denial of relief through all levels of review that comprise the administrative grievance process. Bryant, 530 F.3d at1378 ("To exhaust administrative remedies in accordance with the PLRA, prisoners must 'properly take each step within the administrative process.'") (quoting Johnson v. Meadows, 418 F.3d 1152, 1157 (11th Cir. 2005)); Sewell v. Ramsey, No. CV406-159, 2007 WL 201269 (S.D. Ga. Jan. 27, 2007) (finding that a plaintiff who is still awaiting a response from the warden regarding his grievance is still in the process of exhausting his administrative remedies).

Furthermore, an inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA. Johnson, 418 F.3d at 1157–59; Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000) (inmate's belief that administrative procedures are futile or needless does not excuse the exhaustion requirement). Additionally, "[t]he only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." Smith v. Terry, 491 F. App'x 81, 83 (11th Cir. 2012).

**C.    The Georgia Department of Corrections' Grievance Procedure**

The Georgia Department of Corrections' grievance procedure is set forth in Standard Operating Procedure ("SOP") IIB05-0001.  This SOP no longer requires an inmate to attempt to informally resolve his complaint before filing a formal grievance.  (Doc. 41-3, p. 6.)  An inmate can file, with a few exceptions, "a grievance about any condition, policy, procedure, or action or lack thereof that affects the [inmate] personally."  (<u>Id.</u>)  An inmate must submit a grievance form "no later than 10 calendar days from the date the [inmate] knew, or should have known, of the facts giving rise to the grievance."  (<u>Id.</u> at p. 9.)  The warden has a period of forty (40) calendar days from the date the inmate gave his grievance to the counselor to respond.  An extension of ten (10) calendar days can be granted once, provided the inmate is advised in writing of the extension before the original 40 calendar days have expired.  (<u>Id.</u> at p. 11.)  An inmate can file an appeal with the Commissioner's Office in the following instances: if the grievance coordinator rejects his original grievance; after the warden responds to the original grievance; or the time allowed for the warden's decision has expired.  The inmate has seven (7) calendar days in which to file this appeal.  (<u>Id.</u> at p. 13.)  The Commissioner has 100 calendar days after receipt to render a decision.  (<u>Id.</u> at p. 14.)  Time limits may be waived for good cause.  (<u>Id.</u> at p. 13.)

With these standards and procedures in mind, the Court now addresses Defendants' arguments that Plaintiff did not exhaust his administrative remedies as to his claims against Defendants.

**D.    Assessment of Plaintiff's Exhaustion**

Defendants note Plaintiff filed multiple grievances during the time in which his retaliation claims and forced shaving claims arose, prior to filing this cause of action on October 15, 2014.  (Doc. 41-2, pp. 6–12.)  Nevertheless, Defendants contend Plaintiff did not satisfy his

obligation to exhaust administrative remedies prior to filing suit because he failed to follow proper grievance procedures. (Id. at pp. 8–12.) Specifically, Defendants aver that, as to his retaliation claims, Plaintiff: (1) filed untimely grievances; (2) improperly attempted to grieve more than one issue per grievance; and (3) asserted non-grievable issues. As to Plaintiff's forced shaving claims, Defendants argue that Plaintiff's grievance was untimely filed and did not refer to either of the two instances alleged in Plaintiff's Complaint. (Doc. 41-1, pp. 8–12.) Accordingly, Defendants contend that the Court should dismiss Plaintiff's retaliation claims and forced shaving claims for his failure to properly exhaust administrative remedies prior to filing suit. (Id. at p. 11.)

Plaintiff responds that he exhausted all administrative remedies available to him.[4] To the extent Plaintiff concedes he did not complete each requisite step in the grievance procedure, Plaintiff avers he was prevented from doing so by the policies contained within the Georgia Department of Corrections' ("GDC") SOP. Specifically, Plaintiff contends that, per the SOP, he was permitted to lodge only two grievances at a time—each of which could contain only one issue. As Plaintiff has alleged at least ten claims pertaining to the events of April 12, 2013, he argues that he could not fully exhaust each individual claim in the manner contemplated by the SOP. Accordingly, Plaintiff argues that he exhausted all the administrative remedies available to him, given the constraints of the GDC's SOP. In the alternative, Plaintiff alleges that: (1) Smith State Prison's grievance procedure was "not made known" to him; and (2) Defendants submitted "incomplete and misleading" records regarding his grievance history to create the impression that he failed to properly exhaust his administrative remedies.

---

[4] As to his retaliation claims, Plaintiff avers that he "stated, mentioned, demonstrated and[/]or illustrated 'retaliation' [in] his grievances and appeals on over thirty-five (35) occasions." (Doc. 54-1, p. 6.) A review of Plaintiff's administrative filings reveals that he mentioned the terms "retaliation" and "campaigns of retaliation" in his grievances. Notwithstanding Plaintiff's allegations of retaliation, however, these grievances were ultimately rejected or failed for procedural reasons.

Defendants respond that Plaintiff was aware of the grievance procedure in place at Smith State Prison when his claims arose and that they have accurately presented his grievance filing history to the Court. (Doc. 62, pp. 3–4.) As to Plaintiff's claim that the policies within the grievance procedure prevented him from timely exhausting each of his claims, Defendants argue that Plaintiff has no constitutional right to a prison grievance system and, therefore, has improperly attacked the grievance process. (Doc. 62, p. 3.) Defendants maintain that, regardless of his characterization of the grievance procedure, Plaintiff was required to adhere to that procedure to properly exhaust his claims.

### (1) Plaintiff's Grievances

As of July 3, 2015, Plaintiff had filed thirty-three (33) grievances at Smith State Prison. (Doc. 41-2, p. 6; Doc. 54-1, pp. 2, 5.) It appears that four (4) of these grievances address Plaintiff's retaliation and forced shaving claims. (Doc. 41-8.) Plaintiff filed the first of those grievances, Grievance No. 148811, on May 6, 2013. (Id. at p. 2.) That grievance was rejected because Plaintiff "grieved eleven issues that . . . happened over the course of 83 days," and thus, failed to follow proper grievance procedure, which required Plaintiff to grieve a single issue per grievance and within ten days of the grievable event. (Id. at p. 3.) The second grievance, Grievance No. 149613, was rejected because Plaintiff had two pending grievances in addition to Grievance No. 149613, in violation of the SOP. (Doc. 41-7, p. 3.) The third grievance, Grievance No. 151708, was rejected because Plaintiff presented more than one issue in his grievance, (doc. 41-8, p. 3), and the fourth grievance, Grievance No. 162747, was rejected as untimely filed, (doc. 41-16, p. 2).

(2) **Whether Plaintiff's Grievances Exhausted his Retaliation and Forced Shaving Claims**

As discussed above, Defendants argue that Plaintiff failed to properly exhaust his retaliation and forced shaving claims because the grievances addressing those claims did not comply with the GDC's grievance procedure. (Doc. 41-1, pp. 8–12.) Plaintiff does not dispute that he failed to adhere to proper grievance procedures. However, Plaintiff contends that he should be excused from doing so because, in his view, the grievance procedure is unfair and unconstitutional.

At the time of the events giving rise to Plaintiff's Complaint, Smith State Prison required that inmates: (1) submit a grievance within ten calendar days from the date the [inmate] knew, or should have known, of the facts giving rise to the grievance; (2) present only one issue per grievance; and (3) have no more than two pending grievances at a time. (Doc. 41-3, pp. 7, 9). Plaintiff's Grievances Nos. 148811 and 162747 were rejected for being untimely filed.[5] Grievances No. 151708 was rejected for grieving more than one issue per grievance. Finally, Grievance No. 149613 was rejected because Plaintiff had two grievances pending at the time of submission. In <u>Woodford</u>, the Supreme Court held that, "[i]n order to properly exhaust his claims, a prisoner must . . . comply with any administrative 'deadlines and other critical procedural rules' along the way." <u>See</u> <u>Holley v. Smith</u>, No. CV 110-108, 2010 WL 5671758, at *2 (S.D. Ga. Dec. 30, 2010) (citing <u>Woodford</u>, 548 U.S. at 90). "If a prisoner fails to complete the administrative process or falls short of compliance with procedural rules governing prisoner grievances, he procedurally defaults his claims." <u>Id.</u> (citing <u>Johnson v. Meadows</u>, 418 F.3d 1152, 1159 (11th Cir. 2005)). "Put plainly, 'a Georgia prisoner must timely meet the deadlines .

---

[5] Grievance No. 148811 was additionally rejected because Plaintiff attempted to grieve more than one issue in that grievance.

. . of Georgia's administrative grievance procedures.'" Id. (citing Salas v. Tillman, 162 F. App'x 918, 920 (11th Cir. 2006) (quoting Johnson, 418 F.3d at 1155).

Accordingly, even accepting as true Plaintiff's claim that the grievance procedure is unfair, he still failed to adhere to the applicable procedures. Therefore, under Turner step one, Plaintiff failed to exhaust his administrative remedies as to his retaliation and forced shaving claims. Even if the Court were required to proceed to the second Turner step, the Defendants' account that Plaintiff failed to properly exhaust the administrative remedies as to Defendants' retaliation and forced shaving claims is more credible than Plaintiff's conclusory assertion to the contrary. However, as discussed below, Plaintiff argues it was "impossible" to properly exhaust his retaliation and forced shaving claims under the applicable SOP. Accordingly, Plaintiff maintains that administrative remedies were unavailable to him.

### (3) Whether Administrative Remedies Were Available to Plaintiff at the Time He Filed Suit

Construing Plaintiff's arguments liberally, he contends that he was unable to exhaust administrative remedies due to the confines built into the SOP. Defendants maintain that Plaintiff has no constitutional right to a grievance procedure and that his inability to exhaust each of his claims simultaneously under the SOP is, therefore, inconsequential.

Though the Supreme Court rejected a "special circumstances" exception to exhaustion in Ross, it reiterated that a prisoner need only exhaust those remedies which were available to him. Ross, ___ U.S. ___ 136 S. Ct. 1850, 1856–57 (June 6, 2016) ("An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones."). The Court recognized "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Id. First, the Court stated that, in some instances, the administrative procedure "operates as a simple dead end—with officers unable or consistently

unwilling to provide any relief to aggrieved inmates." Id. Thus, if the administrative procedure lacks authority or if the officials with apparent authority "decline ever to exercise it," the inmate has no obligation to exhaust the remedy. Id. Second, when administrative remedies are so confusing that they are "essentially 'unknowable,'" exhaustion is not required. Id., ___ U.S. ___, 2016 WL 3128839, at *8 (citing Goebert v. Lee Cty., 510 F.3d 1312, 1323 (11th Cir. 2007), and Turner, 541 F.3d at 1084). Lastly, exhaustion is not required "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. However, the Supreme Court recognized that, "[g]iven prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise." Id., ___ U.S. ___, 2016 WL 3128839, at *7.

As discussed above, Plaintiff contends that the administrative remedies officially on the books at Smith State Prison were not made available to him. Specifically, Plaintiff avers it was impossible to timely exhaust each of his claims prior to filing suit. SOP IIB05-0001 provides that an inmate may only have two active grievances pending at one time and that he may present only one issue per grievance. (Doc. 41-3.) For example, if an inmate has more than two active grievances, the procedure states that the inmate must drop one of the outstanding active grievances being processed in order to file a new grievance. (Id.) There are three exceptions to the rule that an inmate may only have two active pending grievances: (1) the additional grievance is filed as an emergency grievance and is determined to be an emergency grievance by the Grievance Coordinator; (2) the additional grievance involves allegations of physical abuse with significant injury to the inmate or sexual assault; or (3) the additional grievance involves an important issue of prison security or administration, such as a serious threat to life, health, or safety of any person. (Id.)

Several courts have found that similar restrictions do not excuse an inmate from exhausting the grievance procedure before filing suit. Howard v. Smith, No. CV606-062, 2008 WL 816685, at *5 (S.D. Ga. Feb. 28, 2008), *report and recommendation adopted in pertinent part, rejected in part*, No. CV606-062, 2008 WL 816684 (S.D. Ga. Mar. 26, 2008) (rejecting inmate plaintiff's argument that he could not exhaust grievance procedure due to former SOP IIB05-0001's limit on grievances and noting that "inmates are given the opportunity to prioritize their grievances by dismissing a pending grievance to allow the resolution of another grievance."); Cummings v. Crumb, 347 F. App'x 725, 727 (3d Cir. 2009) (being on grievance restriction did not prevent inmate from exhausting his remedies); Eckard v. Glebe, No. C14-5898 RJB-KLS, 2015 WL 6507233, at *8 (W.D. Wash. Oct. 5, 2015), *report and recommendation adopted*, No. C14-5898 RJB-KLS, 2015 WL 6507519 (W.D. Wash. Oct. 27, 2015) ("Because [Plaintiff] did not abide by the limitations [the prison] places on the number of grievances that an offender may have active at any one time, he did not properly exhaust his claim[.]"); West v. Endicott, No. 06–C–763, 2008 WL 90622, at *8 (E.D. Wis. Mar. 31, 2008) (prison's limit on number of grievances "does not prohibit the filing of any complaints so much as it requires the inmate to prioritize his claims . . . [t]he rule is not, in other words, an excuse for failure to exhaust."); Ciarpaglini v. Gorske, 07-C-461-S, 2007 WL 5614117 (W.D. Wis. Oct. 4, 2007) (dismissing prisoner lawsuit for exceeding limit on number of grievances).

The reasoning behind these decisions applies with equal force in this case, where Plaintiff alleges that he could not timely present his claims simultaneously to prison administration under the rules of the SOP. Moreover, Plaintiff could have taken advantage of certain exceptions to the grievance restriction rule. For example, Plaintiff could have sought a waiver of the ten-day time limit for good cause in order to timely present each of his claims. (Doc. 41-3, p. 9.)

Alternatively, Plaintiff could have dropped one of his other grievances. Finally, Plaintiff could have asked that prison authorities consider his additional grievances because they involved important issues of prison security or administration. Plaintiff could not simply disregard the grievance process and then argue, after the fact, that any grievance he filed would have been rejected. Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000) ("[T]he exhaustion requirement cannot be waived based upon the prisoner's belief that pursuing administrative procedures would be futile."). Therefore, SOP IIB05-0001's grievance limit and restriction of one claim per grievance did not make the prison's grievance process unavailable to Plaintiff.

Accordingly, even assuming as true Plaintiff's allegation that he could not timely exhaust each of his claims simultaneously under the applicable SOP, he fails to establish that the administrative remedies at Smith State Prison were not capable of use. Again, an inmate must comply with the institution's procedural rules in order to effectuate proper exhaustion. Jones, 549 U.S. at 218; Woodford, 541 U.S. at 90–92. It is not this Court's place to second guess a prison's grievance rules, and an inmate cannot create unavailability by failing to abide by those rules.

In sum, under the first Turner step, Plaintiff does not establish that prison officials were "unable or consistently unwilling to provide any relief to aggrieved inmates," that the grievance process at Smith State Prison was so complicated that it was "essentially unknowable," or that prison officials "thwart[ed] inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross, ___ U.S. ___, 136 S. Ct. at 1859–60. Thus, even if the hurdles to exhaustion existed as Plaintiff claims, they did not rise to the height of unavailability that the Supreme Court contemplated in Ross.

Plaintiff's claims of unavailability wither even more readily when subjected to the crucible of examination the second Turner step requires. Again, under that step, the Court resolves any disputed factual issues and then assesses, under those findings, whether the prisoner has exhausted his available administrative remedies. Turner, 541 F.3d 1083. Having reviewed all of Plaintiff's and Defendants' filings, the Court finds Defendants' account of the availability of administrative remedies more credible than Plaintiff's.

In support of their Motion to Dismiss, Defendants offer the affidavit of Smith State Prison Grievance Coordinator Eyvette Cook, (doc. 41-2), along with Plaintiff's grievance filing history and copies of Plaintiff's grievances. Grievance Coordinator Cook states that, upon admission to Smith State Prison, all prisoners receive an oral explanation of the grievance process and an outline of the grievance process. (Id. at p. 3.) She further testifies that all inmates may review the entire grievance SOP, which is located in the prison's law library. (Id.) This account, which the Court finds to be more credible than Plaintiff's account, contradicts Plaintiff's arguments that "the GDC grievance procedure was 'not made known' [to Plaintiff], [and] was not published for [him]." (Doc. 54-1, p. 5.) Therefore, to the extent Plaintiff contends that he did not know he could request a waiver of the ten-day time restriction for good cause; that he could have dropped one of his other pending grievances; or that he could have asked for his additional grievances to be considered because they involved an important issue of prison security or administration, those contentions are contradicted by the ready availability of the SOP for his review. In addition, Plaintiff's frequent submission of grievances contradicts his claim that he did not know how to use the grievance system. (Doc. 41-4.)

Similarly, Plaintiff's grievance history belies any contention that prison officials thwarted his attempts to file grievances or otherwise made the grievance process unavailable to him.

(Doc. 41-4.)  As of July 3, 2015, Plaintiff had filed over thirty (30) grievances.  (Doc. 41-2, p. 6; Doc. 54-1, pp. 2, 5.)  Pertinently, the grievance procedure at issue, SOP IIB05-0001, has been in effect since December 10, 2012.  (Doc. 41-3, p. 1); see also Velez v. Chatman, No. CV614-074, 2015 WL 649128, at *4 (S.D. Ga. Feb. 13, 2015) ("This SOP was amended with an effective date of December 10, 2012.").  Given Plaintiff's extensive grievance history and Cook's affidavit, Plaintiff's argument that he was somehow ignorant of Smith State Prison's grievance procedure or that he was prevented from using it is not credible.  Wright, 562 F. App'x at 776 ("[I]t was reasonable for the district court to find that [plaintiff's] purported ignorance of the five-day grievance filing period was not credible, given [plaintiff's] significant prior experiences filing grievances and lawsuits in federal court, as well as the jail official's affidavit stating that each [county] inmate is given a copy of the Inmate Handbook spelling out the grievance procedure.")

Finally, the record contradicts Plaintiff's claim that Defendants submitted "incomplete and misleading" records regarding his grievance history to create the impression that he failed to properly exhaust his claims.  (Doc. 54-1, p. 7.)  First, Defendants only submitted as exhibits grievances dating after April 12, 2013, because Plaintiff's claims arose after that date.  (Doc. 62, p. 3.)  Therefore, Plaintiff's reference to Grievance No. 145943, filed on March 20, 2013, and addressing his prior assignment to administrative segregation, is not relevant to the claims presented in this case.  Defendants' failure to submit a copy of that grievance or to discuss this grievance was not misleading.  Furthermore, the two additional exhibits submitted by Plaintiff to support his argument that Defendants misrepresented his grievance-filing history—copies of Grievance Nos. 151708 and 162747—were addressed by Eyvette Cook in her affidavit.  Moreover, all three grievances referenced by Plaintiff were included in the printout Defendants

submitted to the Court containing Plaintiff's grievance filing history, (doc. 41-4). Accordingly, Plaintiff's claim that Defendants misled this Court by failing to accurately present his grievance filing history is without merit.

In sum, Plaintiff filed this lawsuit without properly alerting prison officials to the facts underlying his retaliation and forced shaving claims. An inmate must do more to resolve his dispute within the literal walls, or at least the figurative walls, of the prison system before seeking relief in the halls of the courthouse. Consequently, the Court should **GRANT** this portion of Defendants' Motion and **DISMISS** Plaintiff's retaliation and forced shaving claims against all Defendants **without prejudice**.

## II. Whether Plaintiff States Plausible Claims for Relief Against Defendants

Plaintiff asserts numerous claims against Defendants which implicate his rights under RLUIPA, as well as his constitutional rights pursuant to the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. Defendants contend that Plaintiff has failed to state any claims upon which relief may be granted.

### A. Standard of review

Under a Rule 12(b)(6) motion to dismiss, a court must "accept[ ] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009). "A complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A pleading that offers labels and

conclusions or a formulaic recitation of the elements of a cause of action" does not suffice.

Ashcroft, 556 U.S. at 678.

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal punctuation and citation omitted). While a court must accept all factual allegations in a complaint as true, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. Id.

### B.    Procedural Due Process Claim

In this action, Plaintiff contends Defendant Bynum violated his right to procedural due process during a disciplinary hearing.[6] Specifically, Plaintiff alleges that Defendant Bynum did not allow Plaintiff to speak at his hearing or to call witnesses, refused to view an evidentiary video, and imposed unconstitutional sanctions. Following the hearing, Plaintiff lost nine (9) months' outdoor recreation time, 450 days' commissary, telephone, and package restrictions, and access to rehabilitative programs while confined to administrative segregation. Plaintiff contends he has a protected liberty interest in outdoor recreation time, access to rehabilitative

---

[6]    Plaintiff alleges that the disciplinary report that triggered his disciplinary hearing was a false report. However, "[t]he filing of false disciplinary charges against an inmate does not alone amount to a constitutional violation." Collins v. Upton, No. 5:10-cv-23 (CAR), 2010 WL 1691213, at *2 (M.D. Ga. Mar. 2, 2010) (citing Owens v. Leavins, No. 5:05CV228/SPM/EMT, 2006 WL 2640275, at *2 (N.D. Fla. Sept. 13, 2006)). Accordingly, the veracity of Plaintiff's underlying disciplinary report is immaterial to whether Defendant Bynum violated his procedural due process rights at the hearing.

programs, and recreation, commissary, and phone privileges.  He maintains he was, therefore, entitled to proper process prior to the removal of those privileges.[7]

In the Motion to Dismiss, Defendant Bynum first argues that due process did not attach to the disciplinary proceeding at issue because that proceeding did not affect the length of Plaintiff's prison sentence.[8]  (Doc. 41, p. 14.)  In the alternative, Defendant Bynum argues that recreation time, rehabilitative programs, and commissary, telephone, and package privileges are not protected liberty interests under the Constitution and, therefore, Plaintiff was not entitled to process prior to the deprivation of those privileges.  (Doc. 41-1, p. 14 (citing West v. Higgins, 346 F. App'x 423, 426 (11th Cir. 2009).)  Finally, Defendant Bynum argues that, even if Plaintiff has alleged he had a protected liberty interest, Plaintiff's appeal of Defendant Bynum's disciplinary hearing decision served as adequate process.  (Id. at p. 15.)

An inmate states a cognizable claim for the deprivation of his procedural due process rights under the Fourteenth Amendment when he alleges the deprivation of a constitutionally protected liberty or property interest, state action, and constitutionally inadequate process.  Shaarbay v. Palm Beach Cty. Jail, 350 F. App'x 359, 361 (11th Cir. 2009) (citing Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994)).  "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply."  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  Rather, "a disciplinary proceeding,

---

[7]  Plaintiff also claims that he has a protected liberty interest in his parole eligibility and that Defendant Bynum's sanctions denied him that liberty interest.  However, in his Complaint Plaintiff merely states that Defendant Bynum's sanctions "may have affected [P]laintiff['s] parole eligibility."  (Doc. 1, p. 19.)  Because there is no allegation that Defendant Bynum actually imposed such a sanction, Plaintiff has not shown that any loss of his parole eligibility is attributable to Defendant Bynum.

[8]  As discussed in the remainder of this Report and Recommendation, an inmate is entitled to procedural due process when a change in his conditions of confinement "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S. 472, 484 (1995).  Defendant Bynum's contention that due process only attaches when the sanctions imposed upon a prisoner lengthens the prisoner's sentence is, therefore, without merit.

whose outcome will 'impose[ ] atypical and significant hardship on the inmate' must ensure the following due process rights: (1) advance written notice of the claimed violation, (2) a written statement by the fact finders as to the evidence relied upon and the reasons for the disciplinary action taken, and (3) an opportunity to call witnesses and present documentary evidence in his defense." <u>Asad v. Crosby</u>, 158 F. App'x 166, 173 (11th Cir. 2005) (citing <u>Wolff</u>, 418 U.S. at 563–67).

      "Whether an inmate has a protected liberty interest that would entitle him to due process protections 'is often a difficult determination in the context of a prison, because prisoners have already been deprived of their liberty in the ordinary sense of the term.'" <u>Jacoby v. Baldwin Cty.</u>, 835 F.3d 1338, 1346 (11th Cir. 2016) (quoting <u>Bass v. Perrin</u>, 170 F.3d 1312, 1318 (11th Cir. 1999)). However, in <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), "the Supreme Court gave us the test for determining whether a convicted inmate has a protected liberty interest." <u>Id.</u> "This test examines the hardship imposed on the inmate relative to the 'basic conditions' of prison life." <u>Id.</u> at 1346–47. "Under this test, a convicted inmate is entitled to procedural due process in two circumstances. First, he is entitled to a measure of procedural due process when an increased restraint 'exceed[s] [his] sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force.'" <u>Id.</u> at 1347 (citing <u>Sandin</u>, 515 U.S at 484). "Second, he is entitled to a measure of procedural due process when a change in his conditions of confinement 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" <u>Id.</u> (citing Sandin, 515 U.S at 484).

      "In <u>Sandin</u>, the Supreme Court held that placing a convicted inmate in segregated confinement for thirty days as discipline was not 'a dramatic departure from the basic conditions of [the inmate's] indeterminate sentence' of thirty years to life in prison." <u>Id.</u> (citing <u>Sandin</u>, 515

U.S. 485).  "Therefore, that inmate was not entitled [to procedural protections] before being placed in segregation."  Id.  "The Supreme Court explained that a convicted inmate's disciplinary segregation did not give rise to a protected liberty interest because '[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law.'"  Id. (citing Sandin, 515 U.S. at 485).  "The Court also said the disciplinary segregation at issue in Sandin was 'within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life.'"  Id. (citing Sandin, 515 U.S. at 487).  "Said another way, convicted inmates have no right to a due process hearing before being punished for disciplinary infractions unless the punishment is demonstrably harsher than the ordinary conditions of prison life."  Id.

Courts within this Circuit have found that deprivations of certain privileges during a prisoner's confinement in administrative segregation for an extensive period of time may result in an atypical or significant hardship, as contemplated by the Supreme Court in Sandin.  For example, in Johnson v. Owens, No. 5:14-CV-3, 2014 WL 6620938 (M.D. Ga. Nov. 21, 2014), the United States District Court for the Middle District of Georgia held that a prisoner who had been "in segregation for at least six and a half months under conditions . . . including: deprivation of yard time; isolation; constraint by leg irons and waist chains; deprivation of personal property, commissary, receipt of package privileges; and deprivation of participation in educative, religious, or rehabilitative programs" had stated a liberty interest under the due process clause.[9]  Similarly, here, Plaintiff alleges that he was assigned to "long-term segregation," and he received sanctions including nine months' outdoor recreation time

---

[9]  Cf. Al-Amin v. Donald, 165 F. App'x 733 (11th Cir. 2006) (thirty-month administrative confinement not violative of due process where conditions are substantially similar to conditions of general population).

restriction and 450 days' telephone, commissary, and package restrictions.[10]  (Doc. 1, p. 19.)

Construing Plaintiff's allegations liberally in his favor, he has plausibly alleged that the

combination of conditions imposed upon him during assignment to long-term segregation

presented an atypical or significant hardship in relation to ordinary prison life and, therefore,

deprived him of liberty under the due process clause.  See Wilkinson v. Austin, 545 U.S. 209,

224 (2005) (finding that, while one adverse condition standing alone may not be sufficient to

create a liberty interest, the aggregation of conditions in solitary confinement may impose an

atypical and significant hardship); Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999) (a

deprivation of two hours per week of yard time implicates a liberty interest for a prisoner in close

management); Wallace v. Hamrick, 229 F. App'x 827, 830 (11th Cir. 2007) (unpublished)

(denying motion to dismiss because prisoner's allegations of twenty-eight day administrative

segregation with no hot water, no ventilation, no opportunity to exercise, and without timely

medical care, in violation of GDC's policy, might be sufficient to establish a state created liberty

interest when compared to the conditions of other inmates).

Nevertheless, while Plaintiff plausibly alleges that he suffered a deprivation of liberty, he

has not plausibly alleged that he received inadequate process.  Plaintiff appealed Defendant

Bynum's disciplinary hearing decision on May 9, 2013, and the GDC's Office of Investigations

and Compliance investigated and denied Plaintiff's claims on June 25, 2013.  (Doc. 1, pp. 49–

52.)  "[E]ven if a prisoner is [ ] deprived of his liberty, thus requiring due process, it is well

established that 'the state may cure a procedural deprivation by providing a later procedural

remedy; only when the state refuses to provide a process sufficient to remedy the procedural

---

[10]  It is not clear whether Plaintiff remained confined in long-term segregation during the entirety of his
nine-month restriction of outdoor recreation time.  However, at this stage, the Court must construe all
facts in the light most favorable to Plaintiff.  Fed. R. Civ. P. 12(b)(6).  Accordingly, the Court will
presume that Plaintiff was denied outdoor recreation time for nine continuous months while being held in
segregation.

deprivation does a constitutional violation actionable under section 1983 arise.'"  Baker v. Rexroad, 159 F. App'x 61, 63 (11th Cir. 2005) (citing McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994) (en banc)).  Here, the state provided a later procedural remedy which was sufficient to remedy any procedural due process violations that occurred at Plaintiff's disciplinary hearing.

The Court should, therefore, **DISMISS** Plaintiff's procedural due process claims.

**C.     RLUIPA Claim Based on Exposure of Awrah**[11]

The RLUIPA provides:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of [Title 42], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling government interest; and

(2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a).

"The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc–5(7)(A).  To establish a prima facie case under RLUIPA, the plaintiff must demonstrate that his engagement in religious exercise was substantially burdened by the law, regulation, or practice he challenges.  Knight v. Thompson, 797 F.3d 934, 943 (11th Cir. 2015) ("Knight II").  If he makes this prima facie showing, the burden then shifts to the defendant to prove the challenged regulation is the least restrictive means of furthering a compelling governmental interest.  Id.

---

[11]   Plaintiff also alleged a RLUIPA claim regarding the forced shaving of his beard.  However, as discussed in Section I, Plaintiff failed to exhaust his administrative remedies as to this claim.

The United States Supreme Court clarified the analysis demanded by RLUIPA in Holt v. Hobbs, in which the Court considered the Arkansas Department of Corrections' ("Department") grooming policy and concluded that policy violated RLUIPA insofar as it prohibited the prisoner plaintiff from growing a ½–inch beard in accordance with his religious beliefs.  574 U.S. at ——, 135 S.Ct. at 867.  There was no dispute as to the sincerity of the plaintiff's beliefs, and the Supreme Court concluded the petitioner "easily satisfied" his obligation of demonstrating the grooming policy substantially burdened his religious exercise.  The Court explained: "The Department's grooming policy requires petitioner to shave his beard and thus to 'engage in conduct that seriously violates [his] religious beliefs.'  If petitioner contravenes that policy and grows his beard, he will face serious disciplinary action.  Because the grooming policy puts petitioner to this choice, it substantially burdens his religious exercise."  Id. at ——, 135 S. Ct. at 862 (alteration in original) (citation omitted) (quoting Burwell v. Hobby Lobby Stores, Inc., —— U.S. ——,134 S.Ct. 2751, 2775 (2014)).[12]

In the case at hand, Defendants do not dispute that Plaintiff's beliefs are sincerely held or that Plaintiff's practice of concealing his awrah is an exercise of his religion.  However, Defendants argue that their provision of only one pair of boxer shorts for Plaintiff's escort through the prison did not substantially burden Plaintiff's belief that he may not be naked in the presence of other men.  (Doc. 41-1, p. 16.)  First, Defendants contend Plaintiff was not actually "naked" during his escort to the medical department because he was wearing boxer shorts.  (Id.)  Although his boxer shorts were wet and translucent, Defendants aver that the exposure of Plaintiff's awrah through the boxer shorts was merely a "temporary inconvenience" to his religious practice.

_____

[12]  As explained by the Supreme Court in Holt, Congress enacted the RFRA to provide more expansive protection for religious liberty than the First Amendment.  135 S. Ct. at 860.

29

In response, Plaintiff argues that any exposure of his awrah substantially burdens the exercise of his religious belief. Plaintiff avers he "always keeps his 'awrah' completely covered[ ] while in the presence of others" and wears two pairs of boxer shorts to accommodate this tenet of his religion. Therefore, Plaintiff maintains Defendants' failure to completely cover his awrah or to provide him two pairs of boxer shorts prior to escorting him through the prison yard substantially burdened his religious belief in violation of RLUIPA.

Being forced to engage in conduct that violates one's religious beliefs constitutes a substantial burden under the RLUIPA. Holt, ___ U.S. at ___, 135 S. Ct. at 862. Here, Plaintiff claims he was dragged through a common area containing fifty to sixty other male inmates while his awrah was exposed through wet boxer shorts. Courts have found that the exposure of an inmate's naked body substantially burdens the belief that one may not be naked in front of others. For example, in Woodward v. Perez, No. 12 CV. 8671(ER), 2014 WL 4276416 (S.D.N.Y. Aug. 29, 2015), the plaintiff inmate showed that defendants substantially burdened his belief against being naked in the presence of others by forcing him to shower in the presence of a female prison guard and a homosexual inmate. Similarly, in Granville v. Quarterman, No. H-07-0849, 2012 WL 1309152, at *4 (S.D. Tex. Apr. 16, 2012), the plaintiff inmate demonstrated that "being required to walk down the prison hall unclothed and to shower without wearing boxing [sic] shorts impose[d] a substantial burden on his exercise of religious activity, in that his faith requires he not appear unclothed before any female other than his wife, or before any male not within his own family." See also, Lindh v. Warden, Fed. Corr. Inst., Terre Haute, Indiana, No. 214CV00142JMSDKL, 2016 WL 4528478, at *8 (S.D. Ind. Aug. 30, 2016) (under Holt, prisoner plaintiff satisfied his burden of showing substantial burden on exercise of religion by policy requiring exposure of awrah."). However, at least one other court has found that a Muslim

inmate's belief is not substantially burdened by the requirement that he walk to the shower wearing only boxer shorts and shower shoes. Lewis v. Ollison, 571 F. Supp. 2d 1162, 1170 (S.D. Cal. 2008) ("Plaintiff has at most demonstrated that the temporary shower policy adopted by the prison . . . created at most an inconvenience, but not a significant interference with his religious practice.").[13]

Here, like the inmate in Ollison, Plaintiff wore boxer shorts while walking through the prison. However, Plaintiff alleges that his boxer shorts were wet and translucent and that his awrah was, therefore, completely exposed, like the inmates in Woodward and Granville. At this stage, the Court must construe all facts in the light most favorable to Plaintiff. Therefore, the Court assumes that Plaintiff's wet boxer shorts provided no coverage and that his genitals were fully exposed. Under that set of facts, the exposure of Plaintiff's body in this case resembles that of the plaintiffs in Woodward and Granville more closely. Under Plaintiff's version of facts, he was "put to the choice" of exposing his awrah in violation of his religious beliefs or resisting Defendants' efforts to drag him to the medical unit. As a result, Plaintiff has plausibly alleged that Defendants Abalos, Davis, Griffin, Santiago, and Whitfield substantially burdened his religious belief in violation of RLUIPA.[14]

Nevertheless, the RLUIPA does not authorize claims for monetary damages against prison officials in their individual or official capacities. See Sossamon v. Texas, 563 U.S. 277, 293 (2011) (a suit against defendants in their official capacity is in effect a suit against the state,

---

[13]  Importantly, the decision in Ollison predated the Supreme Court's decision in Holt.

[14]  At this stage, Defendants do not challenge the sincerity of Plaintiff's religious beliefs, argue that they had a compelling government interest which required them to provide Plaintiff only one pair of boxer shorts or to transport him to the medical department while wearing only that garment, or argue that their actions were the least restrictive means in which to further any compelling interest. Accordingly, the Court need not assess whether Defendants had a compelling government interest or used the least restrictive means available to further that interest at this time.

and the "States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA"); <u>Smith v. Allen</u>, 502 F.3d 1255, 1275 (11th Cir. 2007), *abrogated on other grounds by* <u>Sossamon,</u> (RLUIPA did not "creat[e] a private action against individual defendants for monetary damages"); <u>Shaw v. Upton</u>, No. 6:16-CV-6, 2016 WL 5110255, at *1 (S.D. Ga. Sept. 20, 2016) ("Plaintiff cannot maintain any monetary damages claims against Defendants based on his RLUIPA claims."); <u>James v. Taylor</u>, No. 5:15-CV-00266, 2016 WL 1696211, at *2 (M.D. Ga. Mar. 22, 2016), report and recommendation adopted, No. 515CV266CARCHW, 2016 WL 1700393 (M.D. Ga. Apr. 27, 2016) ("Binding Supreme Court and Eleventh Circuit case law prevents Plaintiff from obtaining monetary damages under RLUIPA").[15]   Therefore, the Court should **DISMISS** Plaintiff's claims for monetary damages under the RLUIPA.[16]   However, Plaintiff's claims for injunctive and declaratory relief remain.[17]

[15] Additionally, as discussed below, Defendants are entitled to qualified immunity as to Plaintiff's RLUIPA claims which further bars any monetary relief on the RLUIPA claims.

[16] In its Order adopting my frivolity review Report and Recommendation, the Court already explicitly dismissed Plaintiff's official capacity claims for monetary relief and Plaintiff's RLUIPA claims for monetary relief against Defendants Curtis Whitfield, Johnathan Santiago, Antonio Abalos, and FNU Griffin. (Doc. 36, pp. 2–3.) However, that Order could be misread to allow RLUIPA monetary claims against other Defendants. Therefore, in abundance of caution, I recommend that the Court Order that all RLUIPA claims for monetary relief are dismissed. However, my Report and Recommendation's analysis as to Plaintiff's Official Capacity claims only pertained to Plaintiff's claims for monetary relief. (Doc. 9, p. 8.) Thus, Plaintiff's claims for injunctive relief under the RLUIPA against Defendants remained pending following the Court's adoption of that Report and Recommendation.

[17] In their Motion to Dismiss, Defendants argue that Plaintiff's RLUIPA claims based on forced shaving are now moot. (Doc. 41-1, pp. 16–17.) However, Defendants do not make a mootness argument as to the claims based on the exposure of Plaintiff's awrah.

### D. Free Exercise Claim Based on Exposure of Awrah[18]

In addition to his RLUIPA claim, Plaintiff also claims Defendants violated his free exercise rights under the First Amendment. The Free Exercise Clause "requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." Cutter v. Wilkinson, 544 U.S. 709, 719 (2005). Prisoners retain their First Amendment rights, including rights under the free exercise clause. However, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Brunskill v. Boyd, 141 F. App'x 771, 774 (11th Cir. 2005) (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, (1987)).

"To establish a violation of his right to free exercise," a prisoner "must first establish that a prison official imposed a 'substantial burden' on his practice of religion." Wilkinson v. GEO Grp., Inc., No. 14-10215, 2015 WL 1526642, at *2 (11th Cir. Apr. 7, 2015) (citing Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater, 2 F.3d 1514, 1549 (11th Cir. 1993)). "To prove that his religious exercise was substantially burdened, [plaintiff] must present evidence that he was coerced to perform conduct that his religion forbids or prevented from performing conduct that his religion requires." Id. (citing Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004)). "[A] 'substantial burden' must place more than an inconvenience on religious exercise[.]" Midrash, 366 F.3d at 1227.

"In the prison context, the state actor can defend [an] action" that substantially burdens a prisoner's religious exercise "if [that action] is 'reasonably related to legitimate penological interests.'" Wilkinson, 2015 WL 1526642, at *2 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). Put succinctly, "[i]n a prison setting, to demonstrate a free exercise violation, a plaintiff

---

[18] Plaintiff also alleged a free exercise claim regarding the forced shaving of his beard. However, as discussed in Section I, Plaintiff failed to exhaust his administrative remedies as to this claim.

must show that prison officials administered or implemented a policy or regulation, not reasonably related to any legitimate penological interest or security measure, which substantially burdens and significantly interferes with the practice of his religion or restricts his free exercise of a sincerely held religious belief." Hosey-Bey v. Williams, No. 2:12-CV-959-WHA, 2015 WL 4988388, at *6 (M.D. Ala. Aug. 19, 2015).

Defendants do not dispute the sincerity of Plaintiff's religious belief. Instead, Defendants argue they did not substantially burden Plaintiff's belief by providing him only one pair of boxer shorts during his escort through the prison. (Doc. 41-1, p. 19.) However, Plaintiff maintains his religion requires him to "always keep[ ] his Awrah completely covered" and that he does so by "always wear[ing] two (2) pair[s] of boxers[.]" (Doc. 54-1, p. 12.) Plaintiff argues that the exposure of his awrah through a single pair of wet, translucent boxer shorts substantially burdened his religious belief that he may not be naked in the presence of others. (Id.)

At this stage, the Court must accept as true Plaintiff's factual allegation that his awrah was completely exposed through the boxer shorts provided by Defendants prior to his escort to the medical department. Plaintiff has plausibly alleged that Defendants coerced Plaintiff to perform conduct that his religion specifically prohibits by dragging him into the presence of other inmates and guards while his awrah was visibly exposed. This amounts to an allegation that Defendants Abalos, Davis, Griffin, Santiago, and Whitfield substantially burdened his religious practice in violation of the First Amendment.[19] See Woodward, No. 12 CV. 8671(ER), 2014 WL 4276416 (S.D.N.Y. Aug. 29, 2015), and Granville, No. H-07-0849, 2012 WL 1309152

---

[19] At this stage, Defendants do not argue that their action was reasonably related to any legitimate penological interest.

(S.D. Tex. Apr. 16, 2012).[20]   Nevertheless, as discussed below, Defendants are entitled to qualified immunity as to Plaintiff's free exercise claims for monetary relief.

### E.     Fourth Amendment Claim

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"   U.S. Const. amend. IV.   Though incarcerated, prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement in prison."   Bell v. Wolfish, 441 U.S. 520, 545 (1979).   Nevertheless, prisoners do not enjoy the same Fourth Amendment rights as free persons. See Harris v. Thigpen, 941 F.2d 1495, 1513 (11th Cir. 1991) (noting that a prisoner retains only those rights consistent "with his status as a prisoner or with the legitimate penological objectives of the corrective system") (citations omitted).   For example, prisoners do not enjoy Fourth Amendment protection against searches of their prison cells, and they must submit to routine tests of their blood, hair, urine, or saliva for drugs.   See Hudson v. Palmer, 468 U.S. 517, 526 (1984), and Moton v. Walker, No. 8:09-cv-1986-T-33, 2010 WL 2136553, at * 4 (M.D. Fla. May 26, 2010) (citing Green v. Berge, 354 F.3d 675, 679 (7th Cir. 2004)).

Similarly, prisoners must periodically submit to visual body-cavity searches.   Bell, 441 U.S. at 558.   "[A] 'visual body cavity search' is a strip search that includes the visual examination of the anal and genital areas."   McCabe v. Mais, 580 F. Supp. 2d 815, 822 (N.D. Iowa 2008).   "[T]here is nothing inherently unreasonable about requiring visual body cavity searches" in the prison context.   Moton, 2010 WL 2136553, at * 4 (citing Powell v. Barrett, 541 F.3d 1298, 1305–06 (11th Cir. 2008)).   However, body cavity searches "must be conducted in a

---

[20] Like Plaintiff in this case, the plaintiffs in Woodward and Granville alleged violations of both the RLUIPA and the First Amendment.   Thus, the analysis in those cases is pertinent to both forms of Plaintiff's religious claims.   Additionally, the Eleventh Circuit has indicated that though the protections of the RLUIPA "are not coterminous with the Free Exercise Clause", the substantial burden analysis from RLUIPA cases is instructive in the First Amendment context.   Wilkinson, 617 F. App'x at 918.

reasonable and non-abusive manner[,]" though they need not be "delicately conducted in the least intrusive manner." Id. The Supreme Court has held that "the reasonableness of a [body cavity] search cannot be determined by 'precise definition or mechanical application,' but instead 'requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.'" Powell, 541 F.3d at 1305 (citing Bell, 441 U.S. at 559). "In balancing those interests there are four factors courts must consider: 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" Id. (citing Bell, 441 U.S. at 559).

### (1)     Scope of Intrusion

As to the scope of the intrusion, Plaintiff contends that the search was overly intrusive because Defendants Whitfield and Abalos required Plaintiff to "bend-over at the waist, [at] a 90 degree [a]ngle[,] . . . [and] use both hands [to] spread [his] buttocks apart and [to] expose his anus[.]" (Doc. 1, p. 12.) Defendants, however, argue that the body-cavity search conducted upon Plaintiff was reasonable because it consisted of a visual search only. (Doc. 41-1, p. 21.) The Supreme Court has held that body cavity searches are "admittedly intrusive." Block v. Rutherford, 468 U.S. 576, 586 n.7 (1984); see also Justice v. Peachtree City, 961 F.2d 188, 193 (11th Cir. 1992) (finding a strip search less intrusive when that search did not involve a body cavity search). Accordingly, regardless of whether the search of Plaintiff's body cavity was only visual, that search was inherently intrusive. Moreover, Plaintiff claims that "other means were available for cavity searches," including "metal detectors, X-rays, and[/]or the metal detector chair[ ]," and that Defendant Whitfield had previously agreed to conduct the search in an alternate manner. (Doc. 1, pp. 8–9.) Accepting Plaintiff's allegations as true, Defendants could

have conducted the search in a less intrusive manner. Accordingly, this factor weighs in favor of Plaintiff at this stage of the litigation.

(2)      **Manner in Which the Search was Conducted**

The second factor the Court must examine is the manner in which the search was conducted. Body cavity searches must be conducted in a reasonable, non-abusive manner. Powell, 541 F.3d at 1306. In Evans v. Stephens, 407 F.3d 1272 (11th Cir. 2005), the Eleventh Circuit held that the forceful manner in which a law enforcement officer conducted a body cavity search violated the Fourth Amendment. In that case, the defendant officer arrested two individuals during a traffic stop and then transported them to the jail. Upon their arrival to the jail, "[p]laintiffs were taken to and searched in . . . a broom closet or supply room, not a dedicated search cell, medical examination room, or even a bathroom." Evans, 407 F.3d at 1281 (citations omitted). During the search, the officer used unnecessary force to conduct the searches. Id. First, the officer shoved one plaintiff into the other, causing the men to collapse. Id. When one of the men tried to stand back up, the officer hit him with a baton. Id. Furthermore, "[l]ittle respect for privacy was observed[,]" during the search as "each Plaintiff was forced to disrobe, [and was] ridiculed[ ] and penetrated by an object in front of the other." Id.

Here, Defendants Abalos, Whitfield, and Santiago also conducted Plaintiff's body-cavity search in the presence of Plaintiff's cellmate and used force to do so by "spray[ing] [Plaintiff] severely" with pepper spray. (Doc. 1, pp. 10–12.) According to Plaintiff, the force used was unnecessary because he previously agreed to comply with the search in an alternate manner. (Id. at p. 12.) Defendants argue that the manner in which they conducted the search was reasonable because Plaintiff "was in his own cell and the search was conducted by prison

personnel of the same gender."  (Doc. 41-1, p. 21.)  However, these facts do not outweigh the fact that Defendants forced Plaintiff to strip naked in front of his cellmate, conducted the search in front of Plaintiff's cellmate, and "sprayed [Plaintiff] relentlessly and severely . . . [as Plaintiff] was facing [the] back of [the] cell . . . [and] was not acting disruptively" prior to the search (Doc. 1, p. 10).  Viewing the facts in a light most favorable to Plaintiff, the manner in which Defendants conducted the search was unreasonable and, consequently, this factor also weighs in favor of Plaintiff

### (3)    Justification for Initiating the Search

The third factor the Court must examine is the justification for initiating the search. Here, the body-cavity search occurred during a "shakedown" conducted by the Smith State Prison CERT Team.  "[R]outine shakedowns of prison cells are essential to the effective administration of prisons."  Hudson, 468 U.S. at 529.  Furthermore, "[a] detention facility is a unique place fraught with serious security dangers.  Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.  And inmate[s] [may] attempt[ ] to secrete these items into the facility by concealing them in body cavities[.]"  Bell, 441 U.S. at 559. Accordingly, this factor weighs in favor of Defendants as they had a significant interest in maintaining security in the prison.

### (4)    Place Where the Search was Conducted

For similar reasons, the fourth factor weighs in favor of Defendants.[21]  In the prison context, courts must give considerable weight to the "place in which [the search] is conducted," as prisons are "places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct[.]"  Hudson, 468 U.S. at 526.  Accordingly,

---

[21]  "[T]he combined weight of the third and fourth factors—the justification for the searches and the place they were conducted[ ] . . . merge[ ] into one heavy consideration[.]  Powell, 541 F.3d at 1306.

"correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 326 (2012). Here, the search occurred in a prison where the need to discover and seize contraband is pronounced. Accordingly, this factor also weighs in favor of Defendants.

While the final two factors weigh in favor of Defendants, the first two factors weigh so heavily in Plaintiff's favor that he plausibly alleges that the search was conducted in an unreasonable manner in violation of the Fourth Amendment, notwithstanding the fact that the search occurred in a prison. Therefore, Plaintiff states a plausible claim for relief on this count against Defendants Abalos, Whitfield, and Santiago. Nevertheless, as discussed below, Defendants are entitled to qualified immunity as to Plaintiff's Fourth Amendment claim for monetary damages.

### F.  Eighth Amendment Excessive Force Claims

#### (1)  Pepper Spray

Plaintiff claims that Defendant Whitfield instructed Defendant Abalos to spray Plaintiff with pepper spray to induce Plaintiff to comply with the body cavity search. Plaintiff contends this action violated the Eighth Amendment's proscription against the use of excessive force.

The Eighth Amendment's proscription against cruel and unusual punishment governs the amount of force that prison officials are entitled to use against inmates. Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). An excessive force claim has two requisite parts: an objective and a subjective component. Sims v. Mashburn, 25 F.3d 980, 983 (11th Cir. 1994). In order to satisfy the objective component, the inmate must show that the prison official's conduct was "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (quoting Wilson v. Seiter,

501 U.S. 294, 298 (1991)).  The subjective component requires a showing that the force was used "maliciously and sadistically for the very purpose of causing harm" rather than "a good faith effort to maintain or restore discipline."  Whitley v. Albers, 475 U.S. 312, 320–21 (1986). In order to determine whether the force was used for the malicious and sadistic purpose of causing harm or whether the force was applied in good faith, courts consider the following factors: the need for the exercise of force, the relationship between the need for force and the force applied, the extent of injury that the inmate suffered, the extent of the threat to the safety of staff and other inmates, and any efforts taken to temper the severity of a forceful response. Skelly v. Okaloosa Cty. Bd. of Cty. Comm'rs, 456 F. App'x 845, 848 (11th Cir. 2012) (quoting Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009)).

### a.    The Need for the Exercise of Force

Plaintiff alleges that, prior to Defendants Whitfield's and Abalos' exercise of force, he and his cellmate were "reading the Qu'ran and were in a spiritual state[.]"  (Doc. 1, p. 6.) Defendant Santiago then approached Plaintiff and his cellmate and instructed them to remove their clothing and to submit to a visual search of their anal cavities.  (Id. at p. 7.)  Plaintiff objected to Defendant Santiago's order because the manner of the search violated Plaintiff's religious beliefs.  (Id.)  Plaintiff then requested to comply with the search in a different manner. (Id.)  Plaintiff alleges that Defendant Whitfield agreed to conduct the search in an alternate manner and, in compliance with their agreement, Plaintiff removed his clothing.  (Id. at p. 10.) However, after Plaintiff removed his clothing, "[Defendant] Whitfield dishonored the agreement" and ordered Defendant Abalos to spray Plaintiff and his cellmate with pepper spray. (Id.)  Plaintiff alleges that, prior to Defendants' use of pepper spray, he "was facing [the] back of [his] cell" and "was not acting disruptively."  (Id.)  Plaintiff claims he "was not given a chance to

comply or cooperate" with the alternate search agreed upon prior to being pepper sprayed. (Id.) Defendants respond that, contrary to Plaintiff's claims, "the need for application of force in this situation was great" because Plaintiff repeatedly refused to submit to the search and was warned that Defendants would use pepper spray if he did not comply. (Doc. 41, p. 24.)

Accepting Plaintiff's allegation as true, that he and Defendant Whitfield had agreed to conduct the search in an alternate manner, the need for force in this case was minimal. In an effort to comply with the alternate search method, Plaintiff removed his clothing and stood quietly at the rear of the cell. Accordingly, Defendant Abalos' use of pepper spray was unnecessary, as Plaintiff was attempting to comply with the search at the time this Defendant released pepper spray in his cell. Therefore, this factor weighs in favor of Plaintiff.

b. **The Relationship Between the Need for the Use of Force and the Amount Applied**

Similarly, Defendants argue that their use of pepper spray was reasonable in light of Plaintiff's repeated refusals to follow their orders. (Doc. 41-1, p. 25.) However, Plaintiff responds that "the amount of force. . . was [ ] totally unnecessary, and could have easily been avoided" if Defendants Whitfield and Abalos had used alternate means to conduct the search. (Doc. 54-1, p. 18.) Plaintiff again contends the relationship between the need for the use of force and the amount of force applied was unreasonable because he "was not unruly, nor posed a threat or danger to anyone[.]" (Id. at p. 19.)

As discussed above, accepting Plaintiff's allegations as true, he and his cellmate were attempting to comply with the alternate search at the time Defendant Abalos released pepper spray into the cell. Accordingly, there was no need to use any force to induce Plaintiff's compliance with the search in this case. As a result, the amount of force applied outweighs the need for force. This factor also weighs in Plaintiff's favor.

### c. The Extent of Injury to Plaintiff

Plaintiff alleges that, as a result of Defendants' use of pepper spray, he "suffered excruciating pain, chemical burns on [his] eyes, face and skin, [a] loss of consciousness, emotional and mental injury . . . breathing problems, headaches/migraines, [and] burning for no less than 7 days, [and] nasal discharges[.]" (Doc. 54-1, pp. 15–16.) Plaintiff further claims that his eyes have been permanently damaged and that he "has received . . . years of eye treatment . . . and has been prescribed medicated eye glasses" due to his prolonged exposure to the pepper spray. (Id.) Defendants argue that Plaintiff suffered no more than *de minimis* injury, as Plaintiff only alleges that he suffered "the normal effects of pepper spray: a burning sensation to his eyes and face, difficulty breathing, disorientation and, allegedly, a 'momentar[y]' loss of consciousness." (Doc. 41-1, p. 23.)

However, contrary to Defendants' characterization of Plaintiff's allegations, Plaintiff does in fact claim that he has suffered permanent injury as a result of his exposure to pepper spray. Specifically, Plaintiff alleges that his vision has been permanently damaged. This allegation is sufficient to show that Plaintiff suffered more than *de minimis* injury. See Stallworth v. Tyson, 578 F. App'x 948 (11th Cir. 2014) ("As to whether [Plaintiff's] injuries are *de minimis*, the alleged permanence of his vision loss suggests a severe injury[.]"); cf. Robinson v. Tifft, No. 3:11cv560/LAC/CJK, 2012 WL 2675467, at *2 (N.D. Fla. June 1, 2012) (prisoner failed to show more than a *de minimis* physical injury resulting from officer's use of chemical agent where he alleged he suffered "involuntary closing and burning sensation" in his eyes and was temporarily blinded) (emphasis added). See also Quinlan v. Personal Trans. Servs. Co., 329 F. App'x 246, 249 (11th Cir. 2009) (unpublished) (pretrial detainee's complaints of a headache for several hours after being denied use of his asthma inhaler, difficulty breathing, temporary

chest pain, and lingering back pain that caused him to walk hunched over, which resulted from being transported in a smoke-filled van while handcuffed, were not greater than *de minimis* and therefore did not provide the necessary physical injury to recover for mental and emotional injuries); Jennings v. Mitchell, 93 F. App'x 723, 725 (6th Cir. 2004) (finding that prisoner who suffered the discomfort of pepper spray had shown only *de minimis* injury, insufficient to satisfy § 1997e(e)); Kirkland v. Everglades Corr. Inst., No. 12-22302-CIV, 2014 WL 1333212, at *6 (S.D. Fla. Mar. 31, 2014) ("If [plaintiff] experienced temporary chemical burns and minor respiratory problems from exposure to a chemical agent, he then sustained only minor, physical injuries from the chemical spray."). Here, Plaintiff alleges that he has suffered injuries beyond the normal discomfort of pepper spray including permanent visual injuries as a result of Defendants' use of force. These long-term injuries surpass the threshold of "*de mininis*" injury and, accordingly, this factor weighs in favor of Plaintiff.

### d. The Extent of the Threat to the Safety of Staff and Other Inmates

Plaintiff contends he posed no threat to the safety of staff or other inmates prior to being pepper sprayed because he consented to the search—albeit in an alternate manner—and did not possess any contraband. Plaintiff avers he was "no threat to anyone . . . [as he was] locked behind [a] . . . fortified steel door . . . completely naked and unarmed." (Doc. 54-1, p. 20.) Plaintiff further argues that the threat to staff and inmates prior to the search was minimal because "absolutely no contraband was found," nor has there "ever been any contraband found in [his] rectum or anal cavity[.]" (Id.)

Contrary to Plaintiff's allegations of fact, Defendants maintain that Plaintiff refused to comply with the search in any manner. Therefore, in Defendants' view, the extent of the threat to the safety of staff and other inmates was significant because "[i]t is common practice among

prison inmates to hide contraband in the rectum or anal cavity[.]"  (Doc. 41-1, p. 27.)
Additionally, Defendants argue that Plaintiff's refusal to comply with their demands threatened
institutional order in the prison.  (Id.)

Once again, at this stage, the Court must accept Plaintiff's allegations as true.  Under his
version of facts, Defendant Whitfield agreed to conduct the search in an alternate manner.
Pursuant to this agreement, Plaintiff removed his clothing and waited quietly at the back of the
cell.  Defendant Abalos then sprayed pepper spray into Plaintiff's cell without any provocation.
Accordingly, Plaintiff has plausibly alleged that he posed no threat to the safety of prison staff or
other inmates prior to Defendants' exercise of force.  Therefore, this factor also weighs in favor
of Plaintiff.

e.     **Any Efforts Taken to Temper the Severity of a Forceful Response**

Plaintiff alleges that Defendants not only failed to make any effort to temper the severity
of their forceful response, but they maliciously inflicted more injury upon him following the
initial use of force.  First, Plaintiff claims that Defendants intentionally turned off the water in his
cell after spraying him, causing him to writhe in pain for thirty to forty-five minutes.  (Doc. 54-1,
p. 19.)  Plaintiff claims that Defendants heard him "pleading, screaming, crying, and begging for
help and cold water," but responded by threatening to spray him again.  (Id.)  Plaintiff contends
that when Defendants finally escorted him to a shower, they placed him in an inoperable shower
without running water.  (Id.)  After leaving Plaintiff in this non-functioning shower stall for ten
to fifteen minutes, Defendants then placed him in a shower with scalding hot water.  (Id.)
Following his shower, Defendants Abalos and Santiago violently restrained Plaintiff and dragged
him to the medical unit, dislocating his shoulder.  (Id.)  Defendants characterize these events
differently, arguing they continually tempered the severity of their forceful response by placing

Plaintiff in a shower shortly after exposing him to pepper spray and then promptly escorting him to the medical unit where a nurse evaluated his injuries. (Doc. 41-1, p. 26.)

At this stage, the Court must accept Plaintiff's allegations of fact as true. Accordingly, it appears Defendants continued to inflict pain upon Plaintiff, even after Plaintiff was already subdued. As a result, this factor also weighs in favor of Plaintiff. Because all five factors weigh in favor of Plaintiff, it appears Defendants Whitfiled and Abalos used pepper spray sadistically and maliciously, solely for the purpose of causing harm. Accordingly, the Court should **DENY** this portion of Defendants' Motion to Dismiss Plaintiff's excessive force claims.

### (2) "Chicken Wing" Maneuver

Plaintiff next contends Defendants Abalos and Santiago, per Defendant Whitfield's instruction, used excessive force against Plaintiff on a second occasion by using the "chicken-wing maneuver" to transport him from the showers to the medical unit. (Doc. 1, p. 15; Doc. 54-1, p. 19.) Plaintiff describes the maneuver as a "tactical maneuver [commonly used by police officers and professional wrestlers which is] used to punish and place an opponent in submission." (Doc. 54-1, p. 21.) Plaintiff states that Defendants Abalos and Santiago contorted his arm and shoulder, causing Plaintiff "agonizing and excruciating pain . . . in his right shoulder area, back, and arm." (Doc. 1, p. 14.) As a result, Plaintiff's shoulder was dislocated during the transport. (Doc. 54-1, p. 21.) Plaintiff contends this exercise of force was done maliciously and sadistically for the very purpose of causing harm, evidenced by the permanent damage to his arm, which is "no longer functional." (Id.) Defendants Abalos, Santiago, and Whitfield, however, aver that carrying Plaintiff in such a way was necessary because he passed out during his escort to the medical unit.[22] (Doc. 41-1, p. 28.) The legal standard and factors discussed in

---

[22] Defendants argue Plaintiff fails to allege any facts showing their use of the "chicken wing" maneuver was malicious or sadistic, (doc. 62, pp. 19–20). However, Plaintiff stated in his Complaint that, following

the preceding section apply with equal force to Plaintiff's second excessive force claim, as laid out below.

### a. The Need for the Exercise of Force

Plaintiff argues there was no need for Defendants Abalos and Santiago to carry him to the medical department using the "chicken wing" maneuver, or for Defendant Whitfield to order them to do so. (Doc. 54-1, p. 21.) Plaintiff alleges Defendants chose to carry him in this manner as a form of punishment. Defendants, however, aver that they used the "chicken wing" maneuver "in a good faith attempt to carry Plaintiff to the medical department" to obtain medical care for him. (Doc. 41-1, p. 28.)

Viewing the facts in the light most favorable to Plaintiff, there was no need to exercise force in this context. Plaintiff was unconscious when Defendants Abalos and Santiago used the "chicken wing" maneuver to carry him. Therefore, as Plaintiff was not displaying any resistance toward officers while unconscious, it appears Defendants could have carried Plaintiff in a manner that did not dislocate Plaintiff's shoulder or cause him "excruciating" pain. Accordingly, this factor weighs in favor of Plaintiff.

### b. The Relationship Between the Need for the Use of Force and the Amount Applied

As discussed above, there was no need to exercise force against Plaintiff while he was unconscious. Therefore, the amount of force applied outweighed any need to exercise force. This factor also weighs in Plaintiff's favor.

---

Defendants' action, he "snapped aw[a]ke and cried out in pain; agonizing and execruciating [sic] pain was in his right shoulder area, back[,] and arm." (Doc. 1, p. 14.) Plaintiff then alleges that his cellmate "[saw] the way [Defendants] were mistreating and hurting [Plaintiff] . . . [and] told cert officers to stop doing him like that." (Id. at p. 15.) Defendant Whitfield then instructed CERT team officers to use the "chicken wing" maneuver on Plaintiff's cellmate as well. (Id.) Construing Plaintiff's Complaint liberally, as the Court must at this stage, these facts indicate that Defendants used the "chicken wing" maneuver maliciously as a form of punishment against both men in this situation.

### c.     The Extent of Injury to Plaintiff

Plaintiff alleges that his arm is "no longer fully functional" as a result of his injury and that his shoulder was dislocated during the "chicken wing" maneuver.  (Doc. 54-1, p. 21.) Defendants do not argue that the injury suffered by Plaintiff was "*de minimis*".  Instead, Defendants maintain that they used the "chicken wing" maneuver in a good-faith attempt to escort Plaintiff to the medical department.  (Doc. 62, p. 19.)

Here, Plaintiff alleges that he has suffered permanent injury to his arm as a result of Defendants' use of the "chicken wing" maneuver.  As discussed above, Plaintiff's allegation of permanent injury is sufficient to show he suffered more than *de minimis* injury.  See Stallworth v. Tyson, 578 F. App'x 948 (11th Cir. 2014) ("As to whether [Plaintiff's] injuries are *de minimis*, the alleged permanence of his [injury] suggests a severe injury[.]").  These long-term injuries surpass the threshold of "*de minimis*" injury and, therefore, this factor weighs in favor of Plaintiff.

### d.     The Extent of the Threat to the Safety of Staff and Other Inmates

Plaintiff alleges he was unconscious when Defendants restrained him using the "chicken wing" maneuver.  Accepting this allegation as true, Plaintiff posed no threat to the safety of staff or other inmates during his escort to the medical department.  Accordingly, this factor also weighs in favor of Plaintiff.

### e.     Any Efforts Taken to Temper the Severity of a Forceful Response

The parties do not address whether Defendants took any efforts to temper the severity of the force exercised during their use of the "chicken wing" maneuver.  However, Plaintiff alleges Defendants took him to the medical department after exercising force against him.  Therefore,

because Defendants sought medical treatment for Plaintiff's injuries following their exercise of force, this factor weighs in favor of Defendants. Nevertheless, because the preceding four factors weigh in favor of Plaintiff, he plausibly states an Eighth Amendment excessive force claim at this stage. Accordingly, the Court should likewise **DENY** this portion of Defendants Whitfield, Santiago, and Abalos' Motion to Dismiss.

### G. Eighth Amendment Failure to Intervene Claims

"[A]n officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]") (alterations in original) (citing Ensley v. Soper, 142 F.3d 1402, 1407–08 (11th Cir. 1998)). "This liability, however, only arises when the officer is in a position to intervene and fails to do so." Id.; see also Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010) (explaining that a direct failure to intervene claim "requir[es] the allegations to include facts showing the necessity or real opportunity for the defendant-officers to intervene in a fellow officer's unlawful conduct"). When events occur so quickly he or she cannot intervene, an officer is not liable for another's constitutional violation. Fils v. City of Aventura, 647 F.3d 1272, 1290 n.21 (11th Cir. 2011) (citing Brown v. City of Huntsville, 608 F.3d 724, 740 n.25 (11th Cir. 2010)).

Defendants argue that, even if Defendants Whitfield, Abalos, and Santiago exercised excessive force against Plaintiff, he fails to allege any facts showing that Defendants Williams, Deal, Johnson, McFarlane, Smokes, Davis, and Griffin failed to intervene during those exercises of force.[23] (Doc. 41-1, p. 30.) Specifically, Defendants argue that Plaintiff does not allege

---

[23] Defendants do not argue that Defendants Santiago and Jones—members of the CERT Team—were absent during Plaintiff's pepper spraying or unable to intervene. Accordingly, Plaintiff's Eighth

Defendants Williams, Deal, Johnson, McFarlane, or Smokes were present during Plaintiff's exposure to pepper spray. (<u>Id.</u> at p. 30.) Although Defendants concede that Defendant Davis was present during the incident, they argue Plaintiff fails to allege facts showing Defendant Davis was in any position to intervene. (<u>Id.</u>) Similarly, although Defendants do not dispute that Defendant Griffin was present during the pepper spraying incident, they argue Plaintiff has not sufficiently alleged that Defendant Griffin was in a position to intervene.[24] (<u>Id.</u> at pp. 30–31.) Finally, Defendants aver Plaintiff fails to allege any facts sufficient to show Defendant Griffin was present when Defendant Abalos placed Plaintiff in the "chicken wing" maneuver. (<u>Id.</u> at p. 31.)

In his Complaint, Plaintiff alleges that "[w]hen [Defendant] Whitfield approached Plaintiff['s] cell" to conduct the cavity search "he was accompanied by . . . all other officers [on] . . . the CERT Team and Shakedown team." (Doc. 1, p. 9.) Plaintiff further alleges that "Warden Williams, Deputy Warden Deal, [and] Unit Manager Smokes . . . [were] present during the strip search [and during his exposure to pepper spray], but they never rebuked the acts of the CERT Team." (<u>Id.</u> at p. 12.) He alleges those Defendants "just stood there and just watched" during the incident. (<u>Id.</u>) Plaintiff then avers that "as [he was] coming out of [his] cell" after being sprayed, he "saw Warden Williams, Deputy Warden James Deal, Deputy Warden Wayne Johnson, Captain Andrew McFarlane, [and] Unit Manager Smokes . . . all standing around, but no one reprimanded the officers (Cert Team)" for pepper spraying Plaintiff. (<u>Id.</u> at pp. 12–13.) In addition, Plaintiff states in his Complaint that "[t]he whole Shakedown Team . . . watched as

---

Amendment failure to intervene claims against Defendants Santiago and Jones should proceed as to that claim. For the same reason, Plaintiff's failure to intervene claim against Defendant Jones should proceed as to his excessive force claim regarding the "chicken wing" maneuver.

[24] Defendant Griffin filmed Defendant Abalos as he released pepper spray into Plaintiff's cell.

[Plaintiff was] taken . . . to medical" when he was placed in the "chicken wing" maneuver. (Id. at p. 14.)

Plaintiff reiterates in his Response to Defendants' Motion to Dismiss that Defendants Williams, Deal, Johnson, McFarlane, Smokes, Davis, and Griffin were standing in close proximity during each alleged exercise of force. Plaintiff contends that Defendant Griffin "was maybe [four or five] feet away" and "stood by idly and watched" while he recorded Plaintiff's pepper spraying on a video recorder. (Doc. 54-1, p. 22.) Next, Plaintiff avers that Defendant Davis was "close by at all times, just watching." (Id.) Finally, Plaintiff contends Defendants Williams, Deal, Johnson, McFarlane, and Smokes "were all present in the J-2 dormitory" during his exposure to pepper spray. (Id.)

Construing Plaintiff's Complaint liberally, as the Court must at this stage, Plaintiff alleges sufficient facts to show Defendants Williams, Deal, Johnson, McFarlane, Smokes, Davis, Griffin, Santiago, and Jones were present during his pepper spraying, witnessed that exercise of force, and failed to intervene, despite their ability to do so. Specifically, Plaintiff alleges Defendants Davis, Griffin, McFarlane, Santiago, and Jones were part of a team of correctional officers assembled to conduct Plaintiff's body-cavity search following his refusal to undergo that search. Based on this fact, it appears that the purpose of these Defendants' presence during Plaintiff's pepper spraying was to enforce the body-cavity search. Accordingly, under the facts alleged, Defendant Abalos' decision to spray Plaintiff did not happen so quickly that no other Defendant had an opportunity to intervene. In fact, it appears that each of these Defendants approached Plaintiff's cell with the expectation that force would be exercised. Furthermore, as discussed above, Plaintiff alleges in his Complaint that "Warden Williams, Deputy Warden Deal, [and] Unit Manager Smokes . . . just stood there and just watched" while he was pepper sprayed

and "never rebuked the acts of the CERT Team." (Id.) Similarly, Plaintiff does not allege any facts that suggest Defendants Santiago and Abalos' use of the "chicken wing" maneuver happened so quickly that no other officers could intervene during or after that exercise of force. Accordingly, at this stage, it appears Defendants Williams, Deal, Johnson, McFarlane, Smokes, Davis, Griffin, and Jones were each present during the exercises of force but failed to intervene.[25] The Court should **DENY** this portion of Defendants' Motion to Dismiss, and Plaintiff's failure to intervene claims against Defendants Williams, Deal, Johnson, McFarlane, Smokes, Davis, Griffin, Santiago, and Jones should proceed.

###### H. Eighth Amendment Deliberate Indifference to Serious Medical Needs Claim

The cruel and unusual punishment standard of the Eighth Amendment requires prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer, 511 U.S. at 832. Generally speaking, however, "prison conditions rise to the level of an Eighth Amendment violation only when they involve the wanton and unnecessary infliction of pain." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (quotations omitted). Thus, not all deficiencies and inadequacies in prison conditions amount to a violation of a prisoner's constitutional rights. Rhodes v. Chapman, 452 U.S. 337, 349 (1981). The Constitution does not mandate comfortable prisons. Id. Prison conditions violate the Eighth Amendment only when the prisoner is deprived of "the minimal civilized measure of life's necessities." Id. at 347. However, "[c]ontemporary standards of decency must be brought to bear in determining whether a punishment is cruel and unusual." Bass v. Perrin, 170 F.3d 1312, 1316 (11th Cir. 1999).

---

[25] Similarly, under Plaintiff's version of events, Defendant Santiago was present during Plaintiff's pepper spraying, but failed to intervene. This failure to intervene claim should proceed against Defendant Santiago. However, because Defendant Santiago allegedly participated in the second exercise of force— the "chicken wing" maneuver—Plaintiff may not sustain a failure to intervene claim against Defendant Santiago as to that claim.

In the medical care context, the standard for cruel and unusual punishment, embodied in the principles expressed in Estelle v. Gamble, 429 U.S. 97, 104 (1976), is whether a prison official exhibits a deliberate indifference to the serious medical needs of an inmate. Farmer, 511 U.S. at 828. However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Estelle, 429 U.S. at 105). Rather, "an inmate must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994).

In order to prove a deliberate indifference claim, a prisoner must overcome three obstacles. The prisoner must: 1) "satisfy the objective component by showing that [he] had a serious medical need"; 2) "satisfy the subjective component by showing that the prison official acted with deliberate indifference to [his] serious medical need"; and 3) "show that the injury was caused by the defendant's wrongful conduct." Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007). A medical need is serious if it "'has been diagnosed by a physician as *mandating* treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill, 40 F.3d at 1187) (emphasis supplied). As for the subjective component, the Eleventh Circuit has consistently required that "a defendant know of and disregard an excessive risk to an inmate's health and safety." Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995). Under the subjective prong, an inmate "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Goebert, 510 F.3d at 1327.

"The meaning of 'more than gross negligence' is not self-evident[.]" Id. In instances where a deliberate indifference claim turns on a delay in treatment rather than the type of

medical care received, the factors considered are: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Id. "When the claim turns on the quality of the treatment provided, there is no constitutional violation as long as the medical care provided to the inmate is 'minimally adequate.'" Blanchard v. White Cty. Det. Ctr. Staff, 262 F. App'x 959, 964 (11th Cir. 2008) (quoting Harris, 941 F.2d at 1504). "Deliberate indifference is not established where an inmate received care but desired different modes of treatment." Id.

With these standards in mind, the Court now addresses Defendants Abalos, Williams, Deal, Smokes, Johnson, and McFarlane's arguments that Plaintiff fails to assert a viable claim of deliberate indifference to a serious medical need against them.[26]  First, Defendants contend Plaintiff's physical reaction to pepper spray resulted in no more than *de minimis* injury and, therefore, is not the type of serious medical need required to state a deliberate indifference claim. (Doc. 41-1, p. 32.)  To the extent Plaintiff's reaction to pepper spray can be considered a serious medical condition, Defendants maintain that their efforts to escort Plaintiff to the medical unit belies Plaintiff's argument that Defendants disregarded any serious risk to Plaintiff's health. (Id. at pp. 32–33.)

Plaintiff asserts that his physical reaction to pepper spray resulted in more than *de minimis* injury. (Doc. 54-1, p. 23.)  According to Plaintiff, he "lost[ ] consciousness[,] . . .

---

[26]  In their Motion to Dismiss, Defendants note that, in addition to his Eighth Amendment deliberate indifference to serious medical needs claim, "Plaintiff appears to also assert an Eighth Amendment conditions-of-confinement claim against Defendants Williams, Deal, Johnson, Smokes, McFarlane, Davis, Whitfield, Abalos, Santiago, and Griffin." (Doc. 41, p. 31.)  Defendants maintain that it is unclear whether the Court allowed Plaintiff's medical deliberate indifference claims, as well as his conditions-of-confinement claims, to proceed against each of these Defendants at frivolity review.  As discussed below, Defendants should be entitled to dismissal of Plaintiff's conditions-of-confinement claims.  In contrast, because Plaintiff alleges that he interacted with Defendants Whitfield, Santiago, Griffin, Abalos, Williams, Deal, Smokes, Johnson, and McFarlane during the time in which he requested medical attention, his medical deliberate indifference claims are viable against each of these Defendants. (Doc. 1, pp. 12–14; Doc. 54-1, p. 23.)

couldn't breathe, couldn't see, felt intense burning (all over [his] upper body) and was in excruciating pain." (Id.) Plaintiff contends he "pleaded, begged, screamed for help, medical assistance, and medical treatment[,]" but "[D]efendant[s] Whitfield, Santiago, Abalos, Williams, Deal, McFarlane, Smokes, and Griffin all deliberately ignored [him] and refused to help." (Id.) Plaintiff states Defendants left him in his cell, with no means to wash his face or eyes, for thirty to forty-five minutes. (Id.) Finally, as to his escort to the medical unit, Plaintiff asserts Defendants continued to exhibit deliberate indifference to his serious medical need by "coerc[ing] the nurse to not provide medical treatment." (Id.)

In their Reply to Plaintiff's Response to Defendants' Motion to Dismiss, Defendants admit they left Plaintiff in his cell without any means of decontamination following his exposure to pepper spray for thirty to forty-five minutes. (Doc. 62, p. 22.) However, Defendants maintain this fact is irrelevant to Plaintiff's claims. Defendants argue that, because Plaintiff's injuries were *de minimis* at their inception, they remained *de minimis* thirty to forty-five minutes later. (Id.) Consequently, Defendants assert their "failure to *immediately* secure medical care cannot state a claim for deliberate indifference." (Id. (emphasis added).) Defendants further respond that, even if Plaintiff had a serious medical need, his claim that Defendants were deliberately indifferent to that need fails because they eventually provided him a shower and eventually escorted him to the medical unit. (Id. at pp. 22–23.)

As to Defendants' argument that Plaintiff had no serious medical need, a review of Plaintiff's Complaint and pertinent case law reveals that Plaintiff has plausibly alleged he had a serious medical need. In Danley v. Allen, 540 F.3d 1298, 1312 (11th Cir. 2008), *overruled in part on other grounds by* Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Eleventh Circuit held that defendant jailers exhibited deliberate indifference to a detainee's serious medical need when they

refused to decontaminate the detainee after spraying him with chemical agents. The detainee "claimed that the jailers had sprayed him at close range for three to five seconds in the doorway of a small, poorly ventilated cell, and pushed him into that small cell for about twenty minutes, while he screamed he could not breathe and the jailers laughed at him." McNeeley v. Wilson, 649 F. App'x 717, 722 (11th Cir. 2016) (citing Danley 540 F.3d at 1304.) "The jailers then allowed him a two-minute shower and returned him to a group cell, which was also insufficiently ventilated." Id. The detainee alleged that he suffered chemical conjunctivitis and bronchospasms because of the delay in treatment. Id. "In holding that the plaintiff had stated a claim, [the Eleventh Circuit] stressed that '[t]he serious medical needs Danley alleges . . . are the effects of *prolonged exposure* to pepper spray with inadequate decontamination and poor ventilation, *not the immediate effects of the pepper spray*.'" Id. (emphasis supplied). The Eleventh Circuit concluded that "'the jailers forced Danley to wait for too long before allowing him to shower,' which resulted in needless pain, breathing problems, and inflamed eyes." Id.

Similarly, in McNeeley v. Wilson, 649 F. App'x at 722, the Eleventh Circuit found that a prisoner who complained of burning skin, red eyes, and extreme difficulty breathing after exposure to pepper spray had shown that he had a serious medical need. In that case, the Eleventh Circuit denied defendants qualified immunity because defendants "were on notice that delaying a proper decontamination for over twenty minutes despite complaints about the effects of pepper spray could result in a clearly established constitutional violation." Id. at *4.

As Defendants argue in their Motion to Dismiss, the typical discomfort associated with exposure to pepper spray does not constitute a serious medical need. See Kirkland v. Everglades Corr. Inst., No. 12-22302-CIV, 2014 WL 1333212, at *6 (S.D. Fla. Mar. 31, 2014) ("If [plaintiff] experienced temporary chemical burns and minor respiratory problems from exposure to a

chemical agent, he then sustained only minor, physical injuries from the chemical spray."); Thompson v. Quinn, No. 3:11cv533/RV/EMT, 2013 WL 2151715, at *12 (N.D. Fla. May 16, 2013) (prisoner failed to show more than a *de minimis* physical injury resulting from officer's use of chemical agent where only allegation of physical injury was burning sensation on his body); Kornagay v. Burt, No. 3:09cv281/LAC/EMT, 2011 WL 839496 (N.D. Fla. Feb. 8, 2011) (prisoner failed to show more than a *de minimis* physical injury resulting from officer's use of chemical agent where prisoner alleged he suffered burning lungs and skin, congested breathing, tearing eyes, nasal discharge, dizziness, the sensation of respiratory distress, choking, and burns to his scalp).

Nevertheless, Defendants' assertion that these symptoms can <u>never</u> constitute a serious medical need is incorrect. While a prisoner's instantaneous feelings of discomfort after exposure to pepper spray do not create a serious medical need, the Eleventh Circuit has held that a serious medical need may arise after <u>prolonged exposure</u> to pepper spray, as discussed herein. <u>Danley</u>, 540 F.3d at 1312. In <u>Danley</u>, the detainee was left in a small, poorly ventilated cell for twenty minutes. While jailers eventually took the detainee to a shower, that shower lasted for less than two minutes, and "did not permit [the detainee] adequate time for effective decontamination." <u>Id.</u> at *1304. Here, Plaintiff was left in his cell nearly twice as long as the detainee in <u>Danley</u>. After thirty to forty-five minutes, Defendants placed Plaintiff in a non-working shower for approximately fifteen minutes. Just as the jailers forced the detainee in <u>Danley</u> to wait too long before allowing him to shower, according to Plaintiff, Defendants forced Plaintiff to wait too long to shower in this case. Furthermore, just as a two-minute shower did not adequately decontaminate the detainee in <u>Danley</u>, Plaintiff alleges that his placement in a non-working shower did not adequately decontaminate him from the effects of pepper spray. Plaintiff

plausibly alleges that delaying the decontamination exacerbated his pain and elevated his injuries to create a serious medical need. Accordingly, Plaintiff has sufficiently alleged that he had a serious medical need due to Defendants' failure to remove him from his contaminated cell, followed by Defendants' failure to provide adequate means of decontamination.

Defendants next argue that, even if Plaintiff had a serious medical need, he fails to show Defendants exhibited deliberate indifference to that need. (Doc. 41-1, pp. 32–33.) Defendants contend they "provided [Plaintiff] a shower and promptly escorted him to the prison's medical department" following his exposure to pepper spray. Based upon these actions, Defendants contend they did not disregard the risk to Plaintiff and they did not exhibit more than gross negligence to his medical need.

Plaintiff concedes that Defendants eventually placed him in a shower and escorted him to the medical unit. However, Plaintiff argues that Defendants disregarded his medical needs prior to taking these actions by leaving him in his cell for thirty to forty-five minutes with no running water, placing him in a shower without running water for fifteen minutes, ignoring his pleas for help, and coercing medical staff to withhold treatment from Plaintiff after they escorted him to the medical unit.[27] (Doc. 54-1, p. 23; Doc. 1, p. 13.) Plaintiff also maintains that Defendants' failure to provide him running water for one hour and their refusal to respond to his pleas for help surpassed gross negligence, referencing Defendants' needless delay and derogatory comments toward Plaintiff's religion following his exposure to pepper spray. (Doc. 1, p. 14.)

---

[27] As Defendants note in their Reply to Plaintiff's Response to Defendants' Motion to Dismiss, Plaintiff did not directly allege that Defendants coerced medical staff in his Complaint. (Doc. 62, p. 17.) However, Plaintiff's Complaint stated that he "believe[s] medical staff may have been 'coerced' by [the] CERT team . . . into ignoring [his] needs." (Doc. 1, p. 15.) Given Plaintiff's *pro se* status and the fact that this pleading gave Defendants sufficient notice of Plaintiff's claims, the Court will permit this claim to proceed.

As discussed above, "[t]he meaning of 'more than gross negligence' is not self-evident[.]" Goebert, 510 F.3d at 1327. In instances where a deliberate indifference claim turns on a delay in treatment rather than the type of medical care received, the factors considered are: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Id. Here, Defendants eventually placed Plaintiff in a shower with running water and escorted him to the medical unit. However, Plaintiff avers that Defendants were deliberately indifferent to his serious medical needs during the hour prior to his placement in an operable shower. As discussed above, Plaintiff's need to decontaminate his body from pepper spray was a serious medical need and that condition worsened the longer he was unable to access water. Again, at this stage, the Court must accept Plaintiff's facts as true, and it must construe those facts in Plaintiff's favor. Under that standard of review, Plaintiff has plausibly alleged that Defendants Whitfield, Santiago, Griffin, Abalos, Williams, Deal, Smokes, Johnson, and McFarlane were deliberately indifferent to his medical needs following his exposure to pepper spray.

Therefore, the Court should **DENY** this portion of Defendants' Motion.[28]

---

[28] Plaintiff also claims that Defendants were deliberately indifferent to his serious medical need when they transported him to the medical unit using the "chicken wing" maneuver. However, unlike Plaintiff's argument concerning the one-hour delay between his exposure to pepper spray and Defendants' provision of running water, Plaintiff has not shown that Defendants disregarded a serious medical need during this incident. Plaintiff passed out during his escort to the medical department, and Defendants had to then carry him. Defendants' efforts to secure and transport Plaintiff to the medical unit show that they were actively seeking treatment for his medical needs, as opposed to disregarding them. While it is plausible that Defendants could have transported Plaintiff in a more gentle fashion, their use of the "chicken wing" maneuver does not show that they disregarded Plaintiff's serious medical need, much less disregarded that need with conduct surpassing gross negligence. Therefore, the Court should **GRANT** this portion of Defendants' Motion to Dismiss and **DISMISS** Plaintiff's deliberate indifference to medical needs claims regarding Defendants' Whitfield, Abalos, and Santiago's use of the "chicken wing" maneuver.

## I.      Eighth Amendment Conditions of Confinement Claim

The Eighth Amendment also governs the conditions of a prisoner's confinement.  Helling v. McKinney, 509 U.S. 25, 31 (1993).  Generally, prison conditions rise to the level of an Eighth Amendment violation only when they "involve the wanton and unnecessary infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  "To mount a challenge to a condition of confinement, a prisoner must first prove the condition he complains of is sufficiently serious to violate the Eighth Amendment."  Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004). "The challenged condition must be extreme."  Id.  "At the very least [the prisoner must show the] condition of his confinement poses an unreasonable risk of serious damage to his future health or safety."  Id. (quotations and alteration omitted).  The prisoner must also show that prison officials acted with deliberate indifference to the condition at issue.  Id.; Brown v. Pastrana, 446 F. App'x 270, 272 (11th Cir. 2011).

Although "[t]he Constitution does not mandate comfortable prisons," Farmer, 511 U.S. at 832, it does not allow a prisoner to be exposed to an objectively "unreasonable risk of serious damage to his future health."  Chandler, 379 F.3d at 1289 (quoting Helling, 509 U.S. at 35). Moreover, the conditions of confinement must meet "the evolving standards of decency that mark the progress of a maturing society."  Estelle, 429 U.S. at 102–03 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958) (internal quotation marks omitted)).  To state a successful Eighth Amendment claim, a plaintiff must show: "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) a causal connection between the defendants' conduct and the Eighth Amendment violation."  Brooks v. Warden, 800 F.3d 1295, 1303 (11th Cir. 2015).

Whether a particular condition of confinement constitutes cruel and unusual punishment is an objective inquiry; whether prison officials were deliberately indifferent to that condition is a subjective inquiry. See Wilson v. Seiter, 501 U.S. 294, 298–99 (1991). Prison conditions amount to cruel and unusual punishment only when they result in "unquestioned and serious deprivation of basic human needs." Rhodes, 452 U.S. at 347. "While prison officials must furnish prisoners with adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates, the Constitution does not mandate comfortable prisons[.]" Grimes v. Thomas, No. 2:12-CV-01909-LSC, 2014 WL 554700, at *5–6 (N.D. Ala. Feb. 12, 2014) (internal citations and punctuation omitted), appeal dismissed, (Sept. 17, 2014). As the Eleventh Circuit observed, "[t]he Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration." Harris, 941 F.2d at 1511. "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes, 452 U.S. at 347. Therefore, extreme deprivations are required to make out a conditions-of-confinement claim under the Eighth Amendment. See Chandler, 379 F.3d at 1298. "To be deliberately indifferent, a prison official must knowingly or recklessly disregard an inmate's basic needs." LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993). To establish that an official was deliberately indifferent, "a plaintiff must prove that the official possessed knowledge both of the infirm conditions and of the means to cure that condition, 'so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it.'" Id. (quoting Duckworth v. Franzen, 780 F.2d 645, 653 (7th Cir. 1985)).

For the purposes of this Motion only, Defendants concede that Plaintiff has alleged that he was confined in a cell "flooded and filled with pepper spray" for two weeks and was given no opportunity or supplies to clean his cell. Nevertheless, Defendants argue that Plaintiff's allegation that he developed a rash and hives "fails to show that the conditions of his confinement . . . exposed him to a serious risk to his future health." (Doc. 41-1, p. 34.) In the alternative, Defendants contend that Plaintiff fails to allege *which* Defendants confined him to his cell and fails to show that any Defendants were aware of the condition of his cell. As a result, Defendants maintain that Plaintiff has not shown that any of the named Defendants exhibited deliberate indifference to his condition of confinement. (Id.)

In his Complaint, Plaintiff alleges "Defendants Williams, Deal, Johnson, Smokes, McFarlane, Davis, Whitfield, Abalos, Santiago, and Griffin all subjected [P]laintiff . . . to hazardous conditions of confinement when they placed [P]laintiff and[/]or allowed [P]laintiff to be placed inside a cell covered, filled[,] and flooded with pepper spray/mace; and cell was not properly ventilated." (Doc. 1, p. 28.) Plaintiff argues he faced a substantial risk of serious harm due to his prolonged exposure to pepper spray in his contaminated cell, evidenced by his difficulty breathing and the burning of his eyes and skin, in addition to developing a rash and hives. (Doc. 54-1, p. 23–24.) Plaintiff reiterates in his Response to Defendants' Motion to Dismiss that: (1) "Defendants Whitfield, Abalos, Santiago, and Griffin placed [him] into [the cell,]" (2) "Defendants Williams, Deal, Johnson, McFarlane, and Smokes . . . allowed [him] to be placed inside" the cell, and (3) Defendants Williams, Deal, Johnson, McFarlane, and Smokes witnessed Plaintiff being sprayed and knew that his cell had not been cleaned after he returned to the cell. (Id.)

Therefore, contrary to Defendants' contentions, a review of Plaintiff's Complaint reveals that he has in fact alleged which Defendants knew of and disregarded the contamination of his cell. Nevertheless, Eleventh Circuit case law suggests that Plaintiff did not suffer a "denial of the minimal civilized measure of life's necessities" from his confinement in a contaminated cell. See Thomas v. Bryant, 614 F.3d 1288, 1303 (11th Cir. 2010). In McNeeley v. Wilson, 649 F. App'x 717 (11th Cir. 2016), the Eleventh Circuit indicated that confinement in a cell contaminated with pepper spray does not rise to the level of an Eighth Amendment conditions-of-confinement violation. The Court distinguished the two claims, stating that although prolonged exposure to pepper spray may constitute an excessive force claim, it likely does not state a conditions-of-confinement claim. McNeeley, 649 F. App'x at 723–24 ("Danley involved deliberate indifference and excessive force claims; not conditions of confinement. [Danley] even goes so far as to suggest that failing to decontaminate a cell . . . from pepper spray would not constitute a conditions-of-confinement claim.") (citing Danley, 540 F.3d at 1308–09 ("[S]ubjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions—here, the pepper spray lingering in the air and on him—can constitute excessive force. This circumstance is to be distinguished from environmental conditions that generally affect the inmates in the jail, which are analyzed as conditions of confinement claims.")). Accordingly, Plaintiff has not sufficiently alleged that Defendants violated his Eighth Amendment right against cruel and unusual punishment by leaving him in a cell contaminated by pepper spray.[29] Therefore, the Court should **GRANT** Defendant's Motion to Dismiss Plaintiff's Eighth Amendment conditions of confinement claim.

---

[29] Even if Plaintiff had alleged facts sufficient to state a conditions of confinement claim based on the lingering pepper spray, Defendants would be granted qualified immunity on that claim. McNeeley, 649 F. App'x at 724 ("In any event, McNeeley cites no law clearly establishing a conditions-of-confinement claim based on the failure to decontaminate the prisoner or his cell from pepper spray.").

### J.     Supervisory Liability Claims

Section 1983 liability must be based on something more than a defendant's supervisory position or a theory of *respondeat superior*.  Bryant v. Jones, 575 F.3d 1281, 1299 (11th Cir. 2009); Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 801 (11th Cir. 1998).  A supervisor may be liable only through personal participation in the alleged constitutional violation or when there is a causal connection between the supervisor's conduct and the alleged violations.  Id. at 802.  "To state a claim against a supervisory defendant, the plaintiff must allege (1) the supervisor's personal involvement in the violation of his constitutional rights; (2) the existence of a custom or policy that resulted in deliberate indifference to the plaintiff's constitutional rights; (3) facts supporting an inference that the supervisor directed the unlawful action or knowingly failed to prevent it; or (4) a history of widespread abuse that put the supervisor on notice of an alleged deprivation that he then failed to correct."  Barr v. Gee, 437 F. App'x 865, 875 (11th Cir. 2011).

Defendants contend that Plaintiff's claims against Defendants Williams, Deal, Johnson, and Smokes rely only upon their supervisory positions.  However, for the reasons set forth above, Plaintiff has alleged that Defendants Williams, Deal, Johnson, and Smokes personally participated in the certain violations and deprivations stated in his Complaint.  (Doc. 54-1, p. 22.)  Accordingly, as it appears he is alleging liability based on more than just those Defendants' supervisory positions, the Court should **DENY** this portion of Defendants' Motion to Dismiss.[30]

## III.     Whether Defendants are Entitled to Qualified Immunity

Defendants argue that, even if Plaintiff states plausible claims for relief against them, they are entitled to qualified immunity as to those claims.  (Doc. 41-1, p. 35.)  "The qualified-

---

[30]  Plaintiff is forewarned that, to the extent he relies upon *respondeat superior* principles, his claims will not survive.  However, at this early stage, it appears Plaintiff relies upon these Defendants' direct involvement.

immunity defense reflects an effort to balance 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" Jones v. Fransen, 857 F.3d 843, 850–51 (11th Cir. 2017) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)). "The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate 'clearly established federal statutory or constitutional rights of which a reasonable person would have known.'" Id. at 851 (citing Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted)).

"As a result, qualified immunity shields from liability 'all but the plainly incompetent or one who is knowingly violating the federal law.'" Id. (citing Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)). However, "the doctrine's protections do not extend to one who 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" Id. (citing Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982) (internal quotation marks and alteration omitted)). Additionally, "[b]ecause qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief." Ratliff v. DeKalb Cty., 62 F.3d 338, 340 n.4 (11th Cir. 1995).

"To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority." Fransen, 857 F.3d at 851 (citing Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir. 2013)). "[T]he term 'discretionary authority,' . . . 'include[s] all actions of a governmental official that (1) were undertaken pursuant to the

performance of his duties, and (2) were within the scope of his authority.'" Id. (citing Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted)).

Here, it is clear Defendants were acting within their respective discretionary duties as correctional officers when making decisions relevant to Plaintiff's claims. Thus, the burden shifts to Plaintiff to show that Defendants are not entitled to qualified immunity. Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003). To make this showing, Plaintiff must first establish the violation of a constitutional right on the facts alleged. Saucier v. Katz, 533 U.S. 194, 200 (2001); Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013). As explained above, Plaintiff has alleged conduct by Defendants that, if proven true, plausibly establishes a violation of Plaintiff's: (1) rights under RLUIPA, (2) First Amendment free exercise rights, (3) Fourth Amendment right against unreasonable searches and seizures, and (4) rights under the Eighth Amendment against Defendants' exercise of excessive force, failure to intervene, and deliberate indifference to his serious medical needs. Consequently, his Complaint satisfies the first qualified immunity prong.

Having alleged a constitutional violation, Plaintiff must next demonstrate that the constitutional right was clearly established at the time of the alleged misconduct. Saucier, 533 U.S. at 200.[31] To determine "whether the law clearly established the relevant conduct as a constitutional violation at the time that Defendant Officers engaged in the challenged acts," the defendants must have had "fair warning" that their conduct violated a constitutional right." Fransen, 857 F.3d at 851 (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (citations and quotation marks omitted)). "'Fair warning' comes in the form of binding case [ ] law from the Supreme Court, the Eleventh Circuit, or the highest court of the state [ ] that

---

[31] The Supreme Court has clarified, however, that courts need not analyze these qualified immunity steps sequentially. See Pearson, 555 U.S. at 236.

'make[s] it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates a federal law.'" Id. (citing Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000) (citation omitted)).

"A plaintiff may demonstrate in any one of three ways that a defendant had 'fair warning' that the right he violated was clearly established." Id. at 852 (citing Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012) (citation and internal quotation marks omitted)). "First, a plaintiff may point to binding precedent that is materially similar." Id. (citing Loftus, 690 F.3d at 1204). "This method requires [the Court] to consider 'whether the factual scenario that the official faced is fairly distinguishable from the circumstances facing a government official in a previous case.'" Id. (citing Loftus, 690 F.3d at 1204). "Second, a plaintiff may invoke a 'broader, clearly established principle' that he asserts 'should control the novel facts [of the] situation.'" Id. (citing Loftus, 690 F.3d at 1204–05 (citation and internal quotation marks omitted)). "Because 'fair warning' is the driving force behind a determination that a right has been clearly established, when a plaintiff proceeds in this way, he must show that case [ ] law demonstrated the principle with 'obvious clarity . . . so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" Id. (citing Loftus, 690 F.3d at 1205 (citation and internal quotation marks omitted)). "The violation of a right may also fall into this category when '[t]he reasoning, though not the holding of prior cases . . . send[s] the same message to reasonable officers in novel factual situations.'" Id. (citing Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (citation and internal quotation marks omitted)).

"Finally, a right is 'clearly established' when the defendant's conduct 'lies so obviously at the very core of what the [constitutional amendment] prohibits that the unlawfulness of the

conduct was readily apparent to the official, notwithstanding the lack of case law.'" Id. (citing Loftus, 690 F.3d at 1205 (citation and internal quotation marks omitted)). Courts "recognize the obvious-clarity exception where conduct is 'so bad that case law is not needed to establish that the conduct cannot be lawful.'" Id. (citing Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002)). "[T]his category [is] 'narrow.'" Id. (citing Priester, 208 F.3d at 926–27.) Using these standards, the Court will determine whether Plaintiffs' rights under RLUIPA, the free exercise clause, the Fourth Amendment, and the Eighth Amendment were "clearly established" such that Defendants are not entitled to qualified immunity.

### A.    RLUIPA and Free Exercise Clause Claims based on Exposure of Awrah

As to Plaintiff's RLUIPA and First Amendment free exercise claims, Plaintiff points to no United States Supreme Court, Eleventh Circuit, or Georgia Supreme Court case law which clearly establishes that Defendants' escort of him through the prison yard with his awrah exposed was unconstitutional or violated RLUIPA, and the Court can find none.[32] See Keating, 598 F.3d at 766 (Plaintiff "'must point to law as interpreted by the Supreme Court, the Eleventh Circuit, or the Supreme Court of [the state]' to show that the constitutional violation was clearly established.") (citing Mercado, 407 F.3d at 1159).

---

[32] As discussed above, at least one district court outside the Eleventh Circuit has held that actions similar to those taken by Defendants in this case violated the religious rights of a prisoner plaintiff. See Woodward v. Perez, No. 12 CV. 8671(ER), 2014 WL 4276416 (S.D.N.Y. Aug. 29, 2015) (plaintiff inmate showed that defendants substantially burdened his religious belief that he may not be naked in the presence of others by forcing him to shower in the presence of a female prison guard and a homosexual inmate). However, that same court held that "no case law from the United States Supreme Court or the Second Circuit Court of Appeals supports the theory" that an inmate has a right to refrain from showering naked in the presence of others and granted defendants qualified immunity. Id. at *7. Similarly, here, neither the United States Supreme Court, the Eleventh Circuit Court of Appeals, nor the Supreme Court of Georgia has held that any actions similar to those taken by Defendants violate the First Amendment free exercise clause or RLUIPA. Accordingly, in this Circuit, Plaintiff's right against having his genitals exposed through boxer shorts was not clearly established at the time of Defendants' actions.

Moreover, Defendants' provision of only one pair of boxer shorts does not appear to be so "obviously at the very core of what the [First Amendment and RLUIPA] prohibits" that the unlawfulness of the officers' conduct should have been readily apparent to them. Accordingly, Defendants' decision to escort Plaintiff through the prison in one pair of wet, translucent boxer shorts, in view of other men, did not violate clearly established law. As a result, Defendants are entitled to qualified immunity as to Plaintiff's RLUIPA and free exercise claims based on exposure of his awrah. The Court should, therefore, **GRANT** this portion of Defendants' Motion to Dismiss and **DISMISS** Plaintiff's claims for monetary relief for violation of the RLUIPA and First Amendment due to exposure of his awrah.

However, qualified immunity is not a bar to declaratory and injunctive relief. Ratliff, 62 F.3d at 340, n.4. As discussed above, Defendants make no independent argument, such as mootness, regarding Plaintiff's claims for declaratory or injunctive relief as to Plaintiff's exposure of awrah claims. Thus, his claims for declaratory and injunctive relief on Plaintiff's RLUIPA claim for exposure of his awrah shall proceed.

**B.      Fourth Amendment Search and Seizure**

As discussed above, Plaintiff plausibly alleges Defendants Abalos, Whitfield, and Santiago violated his Fourth Amendment right against unreasonable searches and seizures. Although relevant Fourth Amendment precedent exists in this Circuit, no binding case involves a factual scenario that is similar enough to the one here to have put Defendants on notice that they violated a clearly established right. Accordingly, the Court must determine whether existing "case[ ]law demonstrates the [unconstitutionality of Defendants' actions] with 'obvious clarity . . . so that every objectively reasonable government official . . . [would have] know[n] that the official's conduct did violate federal law when the official acted.'" Fransen, 857 F.3d at

851 (citing Loftus, 690 F.3d at 1205 (citation and internal quotation marks omitted)).  It appears two Eleventh Circuit cases could have informed Defendants whether their actions comported with the Fourth Amendment: Moton v. Walker, 545 F. App'x 856 (11th Cir. 2013), and Evans v. Stephens, 407 F.3d 1272 (11th Cir. 2005).

In Moton, a correctional officer conducted a visual body-cavity search of an inmate "as a part of a routine cell inspection" which required the inmate to repeatedly "bend at the waist, spread his buttocks, and cough[.]"  The Eleventh Circuit held that the correctional officer was entitled to qualified immunity as to the prisoner's Fourth Amendment claim.  The Court explained that, while "[Eleventh Circuit] case law has not established that a visual body cavity inspection as part of a routine search is constitutional under the Fourth Amendment[ . . . ], more importantly, our case law has not clearly established that such a search is unconstitutional.  Therefore, under Moton, officers in this Circuit are entitled to qualified immunity when conducting visual body-cavity searches pursuant to routine cell inspections.

However, in Evans, the Eleventh Circuit found that an arresting officer was not entitled to qualified immunity following an investigatory strip search of two detainees at a county jail.  In that case, the arresting officer conducted the detainees' strip search in "a broom closet or supply room" where "[l]ittle respect for privacy was observed."  Evans, 407 F.3d at 1281.  Specifically, "[e]ach Plaintiff was forced to disrobe, ridiculed, and penetrated by an object in front of the other."  Id.  The Court noted that the "physical aspects of the searches [were] [ ] disturbing," as the detainees were thrown into each other during the search, causing them to collapse.  Id. Elaborating on the unreasonableness of the search, the Court explained that, "while conducting the search, [the arresting officer] inserted the same baton or club—without intervening sanitation—in each Plaintiffs' anus and used the same baton or club to lift each man's testicles."

Id.  The Court then concluded that the arresting officer was not entitled to qualified immunity, reasoning that "[n]o objectively reasonable policeman could have believed that the degrading and forceful manner of th[e] strip search . . . was 'reasonable' in the constitutional sense."  Id. at 1283.

The facts of the present case fall far short of Evans.  The search conducted in this case is similar to the search conducted in Moton, as it took place inside a prison cell as part of a routine shakedown.  However, unlike the search in Moton, Defendants conducted Plaintiff's body-cavity search in the presence of another inmate.  Also unlike the search in Moton, Defendants used force against Plaintiff when conducting the body-cavity search by spraying him with pepper spray.  In this case, as in Evans, force was applied to conduct the body-cavity search.  However, the amount of force applied in this case does not rise to the level of force applied against the detainees in Evans.  For example, Defendants did not penetrate Plaintiff or his cellmate with any objects to conduct the search, as was the case in Evans.  Therefore, the search was not unsanitary or overly invasive in the same manner as the search in Evans.

Accordingly, while Plaintiff's body-cavity search may have been less reasonable than the search in Moton, it was far more reasonable than the search in Evans.  Unlike the situation in Evans, an objectively reasonable policeman would not have clearly known that the cavity search of Plaintiff violated the Fourth Amendment.  Indeed, as noted above, two of the four factors that the Eleventh Circuit has established for the analysis of these claims weigh in favor of a finding of reasonableness.  As a result, neither  Moton nor Evans could have provided Defendants with the type of "fair notice" necessary to overcome qualified immunity, and Defendants are, therefore, entitled to qualified immunity as to Plaintiff's Fourth Amendment claims.

Consequently, the Court should **GRANT** Defendants' Motion to Dismiss Plaintiff's Fourth Amendment claims for monetary relief.

However, as explained above, qualified immunity is not a bar to declaratory and injunctive relief. Ratliff, 62 F.3d at 340, n.4. Defendants make no argument, other than dismissal for failure to state a claim, as to Plaintiff's Fourth Amendment claims for declaratory or injunctive relief. Thus, Plaintiff's Fourth Amendment claims for declaratory and injunctive shall proceed.

### C. Eighth Amendment Excessive Force Claim

"In this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court." Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002) (citing Johnson v. Breeden, 280 F.3d 1308 (11th Cir. 2002)). "There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation." Id. For this reason, Defendants are not entitled to qualified immunity as to Plaintiff's Eighth Amendment excessive force claims.[33] The Court should **DENY** Defendants' Motion to Dismiss Plaintiff's Eighth Amendment excessive force claims.

---

[33] Moreover, as discussed above, Plaintiff alleges he was attempting to comply with the body-cavity search when Defendant Abalos pepper sprayed him and that he was unconscious when Defendants Abalos and Santiago used the "chicken wing" maneuver against him. The Eleventh Circuit has held that it is clearly established that "continu[ing] to use force against a compliant inmate" constitutes excessive force. Jacoby v. Baldwin Cty., 666 F. App'x 759, 765–66 (11th Cir. 2016) (citing Danley, 540 F.3d at 1309 for the proposition that "[w]hen jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive").

### D.      Eighth Amendment Failure to Intervene Claim

As discussed above, Plaintiff plausibly states a claim that Defendants Williams, Deal, Johnson, McFarlane, Smokes, Davis, Santiago, and Griffin failed to intervene when Defendant Abalos sprayed him with pepper spray.  Likewise, Plaintiff states a claim that Defendants Whitfield, Davis, Griffin, McFarlane, and Jones again failed to intervene when Defendants Abalos and Santiago placed Plaintiff in the "chicken wing" maneuver.  Accordingly, the Court must determine whether Plaintiff's right to intervention from the officers standing nearby was "clearly established" at the time Defendants failed to intervene on his behalf.

Just as there is "no room for a qualified immunity defense when the plaintiff alleges" that a Defendant used "excessive force in violation of the Eighth Amendment," Skrtich, 280 F.3d at 1301, a reasonable correctional officer would know that he violates an inmate's rights when he fails to intervene during a fellow officer's use of excessive force against the inmate.  See Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]" (alterations in original)) (citing Ensley v. Soper, 142 F.3d 1402, 1407–08 (11th Cir. 1998)).  Therefore, Defendants Williams, Deal, Johnson, McFarlane, Smokes, Davis, Santiago, and Griffin are not entitled to qualified immunity as to their failure to intervene during Plaintiff's exposure to pepper spray.  For similar reasons, Defendants Whitfield, Davis, Griffin, McFarlane, and Jones—all members of the CERT team that transported Plaintiff to the medical department—are not entitled to qualified immunity for failing to intervene when Defendants Abalos and Santiago placed Plaintiff in the "chicken wing" maneuver.

### E.    Eighth Amendment Deliberate Indifference to Medical Needs

Similarly, as to Plaintiff's Eighth Amendment deliberate indifference to medical needs claims, Eleventh Circuit case law demonstrates that Plaintiff had a clearly established right against prolonged exposure to pepper spray.  In McNeely, 649 F. App'x at 723, the Eleventh Circuit rejected defendants' qualified immunity arguments regarding the plaintiff's claims because defendants "were on notice that delaying a proper decontamination for over twenty minutes despite complaints about the effects of pepper spray could result in a clearly established constitutional violation."  Accordingly, Defendants are not entitled to qualified immunity as to this claim.

The Court is not concluding today that Defendants did in fact violate Plaintiff's Eighth Amendment rights.  On the record before the Court, we cannot know.  However, if the Court accepts Plaintiff's factual allegations as true, as it must, then the actions that Defendants allegedly took were, "in the light of the preexisting law—beyond what the Constitution would allow under the circumstances."  Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir. 2010).  For these reasons, the Court should **DENY** this portion of Defendants' Motion.

## III.    Plaintiff's Motion for Injunction

In his Motion for Injunction, Plaintiff alleges that Defendant Smokes prevented him from receiving legal materials and reading materials in violation of his First, Fifth, and Fourteenth Amendment rights.  (Doc. 83.)  Plaintiff also alleges that, in March 2015, Defendant Smokes tried to force Plaintiff to shave his beard; that his grievance coordinator and grievance counselor ignored the grievances concerning this forced shaving claim; and that these two individuals are "working in concert with Defendant Smokes" to conceal Defendant Smokes' unconstitutional actions.  (Id.)

It appears Plaintiff may be seeking to bring additional claims and to add additional defendants through his Motion for Preliminary Injunction, which he may not do. See Fed. R. Civ. P. 15(a) ("A party may amend his complaint once as a matter of right . . . within twenty-one (21) days after service of a motion under Rule 12(b), (e), or (f). In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.") Plaintiff filed his Motion several months after Defendants filed their Motion to Dismiss. Plaintiff has received neither Defendants' consent to add these claims nor sought the Court's permission to add additional claims or defendants. Furthermore, even if Plaintiff had properly amended his Complaint to assert additional claims and to add additional defendants, his Motion would be subject to dismissal as these claims are not related to the claims asserted in his original complaint. Additionally, he could not have exhausted his administrative remedies as to these claims at the time this lawsuit was filed as these claims arose after the filing of this suit.

Additionally, Plaintiff is not entitled to interlocutory injunctive relief at this time. To be entitled to a temporary restraining order or preliminary injunction, a plaintiff must demonstrate: (1) a substantial likelihood of ultimate success on the merits; (2) that a restraining order or injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm that the restraining order or injunction would inflict on the other party; and (4) that the restraining order or injunction would not be adverse to the public interest. Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225–26 (11th Cir. 2005). Similarly, a plaintiff requesting a permanent injunction must satisfy the following four-factor test: (1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by a permanent injunction.  <u>eBay, Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006).  Thus, "[t]he standard for a permanent injunction is essentially the same as for a preliminary injunction except that the plaintiff must show actual success on the merits instead of a likelihood of success."  <u>Siegel v. LePore</u>, 234 F.3d 1163, 1213 (11th Cir. 2000) (Carnes, J., dissenting).  In either case, an "injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites."  <u>Horton v. City of Augustine</u>, 272 F.3d 1318, 1326 (11th Cir. 2001).

As explained above, while Plaintiff attempts to assert additional claims and to add additional defendants by way of his Motion for Injunction, he cannot do so.  Because those claims are not before the Court, the Court obviously cannot grant Plaintiff preliminary or permanent injunctive relief on the claims.  Moreover, two of the three individuals allegedly responsible for violating Plaintiff's constitutional rights in this instance are not properly before the Court.  Because these proposed defendants who would be responsive to the injunction are not parties to this action, this Court lacks jurisdiction to enter any injunction against them.  <u>See</u> <u>In re Infant Formula Antitrust Litig., MDL 878 v. Abbott Labs.</u>, 72 F.3d 842, 842–43 (11th Cir. 1995) (stating that district court lacks subject-matter jurisdiction to issue preliminary or permanent injunction against nonparty).  Moreover, at this point, Plaintiff has not established a substantial likelihood of ultimate success on the merits of his claims.  For these reasons, I **RECOMMEND** that the Court **DENY** Plaintiff's Motion for Injunction.

### III. Plaintiff's Motions for Judgment as a Matter of Law and Motion for Default Judgment, (docs. 46, 71, 72, 73, 75)

Plaintiff has inundated this Court with additional filings, which he titles "Motions for Judgment as a Matter of Law," (docs. 71, 72, 73, 75), as well as a Motion titled "Motion for Default Judgment," (doc. 46).  In each of these essentially identical Motions, Plaintiff requests

this Court enter judgment against Defendants, claiming they have failed to respond to his myriad filings and have failed to sign documents filed with the Court. Plaintiff's Motions, which are properly construed as motions for default, are meritless. Defendants have properly and timely responded to Plaintiff's filings and have signed each of their filings with this Court. Accordingly, the Court should **DENY** Plaintiff's Motions for Judgment as a Matter of Law and Motion for Default Judgment.

## CONCLUSION

For the reasons and in the manner set forth above, I **RECOMMEND** that the Court **GRANT in part** and **DENY in part** Defendants' Motion to Dismiss. (Doc. 41.) Further, the Court should **DENY** Plaintiff's Motion for Default Judgment, **DENY** Plaintiff's Motions for Judgment as a Matter of Law, and **DENY** Plaintiff's Motion for Injunction.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within fourteen (14) days of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not

meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon the parties.

SO ORDERED and **REPORTED and RECOMMENDED**, this 9th day of August, 2017.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA